RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

RITA R. JOHNSON,

                 *Plaintiff-Appellant*,

    *v.*

TIMOTHY MORALES; DENNIS JORDAN; CITY OF SAGINAW,

                 *Defendants-Appellees*.

No. 17-2519

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:17-cv-12405—Thomas L. Ludington, District Judge.

Argued: October 16, 2018

Decided and Filed: January 7, 2020

Before: COLE, Chief Judge; WHITE and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant. Robert A. Jordan, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellees. **ON BRIEF:** Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellant. Robert A. Jordan, Gregory W. Mair, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellees.

     NALBANDIAN, J., delivered the opinion of the court in which COLE, C.J., and WHITE, J., joined, except as to the issues discussed in Sections IV.D, IV.G, and IV.I of his opinion. WHITE, J. (pp. 30–37), delivered the opinion of the court as to those issues, in which COLE, C.J., joined. Judge Nalbandian's discussion of those issues represents his dissent.

———————————

**OPINION/DISSENT**

———————————

**I.**

NALBANDIAN, Circuit Judge.  Plaintiff Rita Johnson challenges the suspension of her business license by Defendants City of Saginaw, City Manager Timothy Morales, and City Human Resources Director Dennis Jordan.  Morales issued Johnson a notice to immediately suspend all commercial activities at her restaurant.  This came after persons unaffiliated with Johnson or her restaurant began shooting at it one night.  Jordan upheld the suspension in a hearing where he served as the hearing officer.  And an appeal panel later upheld his decision.  Johnson eventually filed this action in the district court, alleging several constitutional violations.  She now appeals the district court's order dismissing her case for failure to state a claim and denying her leave to amend her complaint.  For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND.[1]

**II.**

Rita Johnson owns and operates Rita's Southern Soul Café in the City of Saginaw, Michigan ("City").[2]  One evening, Johnson rented her restaurant to a private party.  For unknown reasons, individuals unaffiliated with her or the party emerged from a vehicle that night and began shooting at the restaurant.  According to Johnson, no guest of the restaurant instigated the

---

[1]This opinion constitutes the majority opinion on Johnson's claims that (1) Defendants violated due process by having Jordan review his immediate supervisor's decision to suspend Johnson's license; (2) Defendants violated due process because one of the City's attorneys had represented Jordan in an unrelated case six years before; (3) Defendants violated due process by denying Johnson a pre-suspension hearing; (4) section 110.06(E) of Saginaw's Code of Ordinances, which regulates the process of appealing a suspension decision, violates due process; and (5) section 110.06(F) is unconstitutionally vague both on its face and as applied to Johnson's case.

This opinion dissents regarding the judgment on Johnson's claim that section 110.06(D) violates due process.  Johnson asserted a facial challenge to the ordinance and not an as-applied challenge, as the majority believes.  And placing the burden on the licensee at the first post-suspension hearing does not violate due process.  Finally, this opinion dissents on Johnson's equal protection and substantive due process claims.

As a result, Section IV.D, Section IV.G, and Section IV.I do not represent the majority opinion.

[2]The district court dismissed Johnson's complaint for failure to state a claim and denied her leave to amend her complaint on futility grounds.  So we take her well-pleaded factual allegations as true.  *Bennett v. MIS Corp.*, 607 F.3d 1076, 1091 (6th Cir. 2010).

shooting.  Nor did the shooting "ha[ve] [anything] to do with the commercial activities of [her] business."  (R. 15-1, Proposed Second Am. Compl. at PageID #250 ¶ 17.)  Although police were called during the shooting, they never apprehended any of the shooters.  But Saginaw Police Chief Robert Ruth opined that the incident may have "involve[d] gangs from the 'southside' and 'northside' of Saginaw."  (*Id.* ¶ 21.)

Less than two days after the shooting, City Manager Timothy Morales issued Johnson a notice ordering the suspension of all business activity related to her restaurant.  Morales issued the suspension order under section 110.06(F) of Saginaw's Code of Ordinances.  Section 110.06(F) allows the city manager to immediately suspend any license or permit issued by the City if he considers the suspension necessary and "in the interest of the public health, morals, safety, or welfare[.]"  Saginaw, Mich., Code of Ordinances § 110.06(F) (2018).

The suspension order listed the following non-exclusive reasons for suspending Johnson's license:

1. Serious and violent criminal activity generated by the operation of this establishment;

2. The aforementioned serious and violent criminal activity has resulted in significant injury to persons and damage to property;

3. The aforementioned serious and violent criminal activity has occurred as recently as Saturday, May 6, 2017;

4. The aforementioned serious and violent criminal activity constitutes a hazardous condition contrary to the health, morals, safety and welfare of the public;

5. Failure to maintain adequate security to prevent or discourage unlawful behavior[.]

(R. 15-1, Proposed Second Am. Compl. at PageID #265 (alterations omitted).)

The order also informed Johnson that a hearing would occur three days later, where she would have to "show cause" as to why her license should not remain suspended or revoked.  (*Id.* at PageID #251 ¶¶ 33–36.)  A little over two months after the hearing, Human Resources Director Dennis Jordan issued a decision upholding the suspension of Johnson's license.

But Johnson believed she did not receive a fair administrative process.  So she filed a complaint in the district court alleging that Defendants had violated several of her constitutional rights.

Johnson then amended her complaint to include additional factual allegations and another count against Defendants.  She also filed a motion for a temporary restraining order and, alternatively, a motion for a preliminary injunction to prevent Morales from sitting on the appeal panel expected to review Jordan's decision.  The district court denied that motion.  Later, Defendants moved to dismiss Johnson's complaint for failure to state a claim.

After the district court denied Johnson's motion for equitable relief, she filed her administrative appeal.  The appeal panel, which did not turn out to include Morales, held a hearing where it affirmed Jordan's decision upholding the suspension of her license.  The very next day, Johnson filed a motion for leave in the district court to amend her complaint again.  And roughly two months later, the district court granted Defendants' motion to dismiss and denied Johnson's motion to amend her complaint on futility grounds.

This appeal followed.

## III.

We review the district court's grant of Defendants' motion to dismiss de novo.  *Beydoun v. Sessions*, 871 F.3d 459, 464 (6th Cir. 2017) (citing *Kottmyer v. Maas,* 436 F.3d 684, 688 (6th Cir. 2006)).  Because the district court denied Johnson's motion to file a second amended complaint on futility grounds, we review that decision de novo.  *Id.* (citing *Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010)).  Several of Johnson's claims overlap both complaints; we analyze those claims before we analyze the claims unique to her proposed second amended complaint.

## IV.

## A.

In Count I of Johnson's first amended complaint and Count IV of her proposed second amended complaint, Johnson alleges that the City and Jordan violated her due process rights by having Jordan serve as the hearing officer at her initial administrative hearing.  Her argument

rests on a "command influence theory," which she articulates as follows: "[I]mmediate subordinates are not 'neutral and detached' enough to satisfy due process when called upon to review an immediate boss's decision." (Johnson's Opening Br. at 18.) According to Johnson's theory, Jordan was not "neutral and detached" enough to serve as her hearing officer. (*Id.* at 10.) This is because he was sitting in review of his immediate supervisor's decision to suspend her license.

Federal due process "guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). But we apply an objective standard in evaluating whether the government has fulfilled that guarantee. *Id.* So in reviewing claims of actual bias, we "ask[] not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Id.* (internal quotation marks omitted). Moreover, claims of bias "must overcome a presumption of honesty and integrity in those serving as adjudicators[.]" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

Johnson traces the origins of her theory to two state court decisions: *State ex rel. Ellis v. Kelly*, 112 S.E.2d 641 (W. Va. 1960) and *Mayer v. Montgomery County*, 794 A.2d 704 (Md. Ct. Spec. App. 2002).[3] We examine both in turn.

---

[3]It is unsurprising that Johnson does not substantially rely on the Supreme Court's recusal precedents. After all, the Court has declined to find an unconstitutional risk of bias in all but a few narrow circumstances—none of which apply here. Before its decision in *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), the Court had only required recusal in two types of situations. The first was "when the judge ha[d] a financial interest in the outcome of the case," and the second was "when the judge [was] trying a defendant for certain criminal contempts." *Id*. at 890 (Roberts, C.J., dissenting).

In *Caperton*, the Court held that there is an unconstitutional risk of bias "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id*. at 884. The narrowness of its holding reflected the Court's perception that it was dealing with an "extreme case" that presented "an extraordinary situation" with facts it considered "extreme by any measure." *Id*. at 887. This, the Court explained, was characteristic of its recusal cases, each of which "dealt with extreme facts that created an unconstitutional probability of bias that 'cannot be defined with precision.'" *Id*. (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986)).

The Court next revisited its recusal jurisprudence in *Williams*. There, once again, the Court framed its holding narrowly: "[W]here a judge has had an earlier significant, personal involvement as a prosecutor in a critical

In *Kelly*, West Virginia's Department of Motor Vehicles ("Department") suspended a used car dealer's license after the Department's commissioner investigated the dealership and found that the dealer had breached certain record-keeping requirements. 112 S.E.2d at 642. The Department later held a hearing on the suspension. *Id.* at 643. There, the deputy commissioner served as the hearing officer and the commissioner testified before the deputy. *Id.* West Virginia's Supreme Court of Appeals held that this violated due process. The court found:

> It can hardly be contended that the commissioner, in the making of the investigation and in testifying before the deputy commissioner appointed by him and responsible to him, beyond any reasonable probability, did not become biased and prejudiced in the matter being heard. It would seem to be beyond human experience and expectation for impartiality to result where the officer is the investigator, prosecutor, witness and trier of the facts.

*Id.* at 644.

But it was essential to the court's analysis that "the commissioner personally conducted the investigation and personally testified before his deputy." *See id.* at 643. In contrast, Johnson alleges neither that Morales testified at her hearing nor that he investigated her business. Johnson's argument hinges on her allegations that Morales issued the suspension order, selected Jordan to serve as the hearing officer, and is Jordan's immediate supervisor. Because Morales was not the "investigator, prosecutor, witness and trier of the facts" in Johnson's case, *Kelly* is inapposite.

The second case Johnson relies on, *Mayer*, involved a county police sergeant who sought a promotion to the rank of lieutenant. 794 A.2d at 706. The sergeant filed a grievance after he was denied the promotion. And a county director denied his grievance through a written "Step II" response. *Id.* at 708. Then, the County Administrative Officer ("CAO") designated a subordinate of the director to conduct a "Step III" hearing. So the sergeant requested a different hearing officer. *Id.* He argued that the subordinate "would be loath to render a decision adverse to that of her superior and therefore would not be impartial, or at least would not appear to be impartial." *Id.* The CAO denied the sergeant's request for a different hearing officer. And the

---

decision in the defendant's case, the risk of actual bias in the judicial proceeding rises to an unconstitutional level." *Williams*, 136 S. Ct. at 1910. The situation here bears no resemblance to either *Caperton* or *Williams*.

subordinate denied the grievance. *Id.* at 709. So the sergeant appealed. Yet the Maryland Court of Special Appeals concluded that "the CAO's appointment was contrary to the governing laws . . . ." *Id.* at 717.

But those "governing laws" did not refer to the Due Process Clause. Instead, they referred to the *county's* "governing [] laws, regulations, or procedures," which the court cited at the beginning of its analysis. *Id*. at 709, 711–12.[4] Indeed, the sergeant's argument was "that the fairness requirements of the applicable *Montgomery County* personnel laws and procedures were [not] satisfied in his grievance . . . ." *Id.* at 711–12 (emphasis added). That said, part of the court's reasoning relied on *Kelly*, which analyzed federal due process. *See id.* at 712–13. Yet the court distinguished the sergeant's case from various federal due process cases that the county cited in its brief. *See id.* at 714–15. At the very least, it does not appear as though the court was exclusively interpreting the Due Process Clause when it ruled for the sergeant.

Even assuming the contrary, *Mayer* would still be inapt. *Mayer* held that "when . . . the Step III hearing officer is a subordinate of the Step II responder, there is a substantial likelihood that the hearing officer[] . . . will not render an impartial decision[.]" *Id.* at 714. But it was critical to the court's decision that both the Step II and Step III officers were adjudicators. *See id.* And it was on that basis that the court distinguished another case: *Consumer Prot. Div. Office of Att'y Gen. v. Consumer Publ'g Co., Inc.*, 304 Md. 731, 763 (Md. 1985). There, "the mere fact that both the prosecutorial and adjudicatory functions occurred within the Attorney General's Office was not a due process violation and, in fact, those . . . who participated in the investigation and filing of charges did not participate in the adjudicatory phase of the case." *Mayer*, 794 A.2d at 714. In the sergeant's case, "by contrast, . . . a subordinate was called upon to pass judgment on the correctness . . . of his superior's *decision resolving a grievance*." *Id.* (emphasis added).

---

[4]Those "laws, regulations, [and] procedures" included (1) the Montgomery County Council's statement of legislative intent for its merit system law; (2) provisions of the Montgomery County Code; (3) provisions of the Montgomery County Personnel Regulations ("MCPR"); and, (4) a state administrative procedure. *Mayer*, 794 A.2d at 709–12.

Unlike the Step III hearing officer in *Mayer*, Jordan did not review an adjudication. Rather, he reviewed an enforcement action taken by Morales—the suspension of Johnson's business license. And *Mayer* said that such a blend of executive and adjudicative functions within an agency does not violate due process. More importantly, the Supreme Court held as much. *See Withrow*, 421 U.S. at 95. Johnson asks us to find that due process precludes agency adjudicators from reviewing the executive actions of their direct supervisors. But that position is unsupported by either our precedent or the Supreme Court's. And the two state court cases Johnson directs us to do not support her theory. We therefore hold that Jordan's participation in Johnson's hearing as the hearing officer did not present an unconstitutional risk of bias.

**B.**

In Count I of Johnson's first amended complaint and Count VI of her proposed second amended complaint, Johnson lodges another due process claim against Jordan and the City. She argues that Jordan should have recused himself because one of the City's attorneys at her hearing, Gregory Mair, had represented Jordan in another case. In that case (unrelated to Johnson's), a police officer sued Jordan and other City officials, alleging that they discriminated against him because of his race and disabilities. *See Ramirez v. City of Saginaw*, No. 10-13408-BC, 2011 WL 6309158 (E.D. Mich. Dec. 15, 2011).

Johnson cites just one case, *Morrissey v. Brewer*, 408 U.S. 471 (1972), supporting her argument. But *Morrissey* did not address this issue, and Johnson does not explain its relevance in her brief. And this circuit held that a school board did not violate due process when one of its attorneys acted as the hearing officer in a suspension hearing that it commenced against a school superintendent. *See Prichard v. Lafferty*, 974 F.2d 1338, 1992 WL 205659, at *4 (6th Cir. 1992) (table). There, we said that "[n]either [the hearing officer's] familiarity with the situation nor his relationship to the Board *per se* disqualified him." *Id.*

Here, there is even less potential for bias since Jordan was not himself an attorney for the City—one of the City's attorneys had merely represented him in an unrelated case six years before. *See also Dell v. Bd. of Educ., Twp. High Sch. Dist. 113*, 32 F.3d 1053, 1065–66 (7th Cir. 1994) (holding that a school district did not violate due process where its law firm had

represented the hearing officer's employer); *James v. Indep. Sch. Dist. No. I-050 of Osage Cty.*, 448 F. App'x 792, 798 (10th Cir. 2011) (holding that members of a school board did not violate due process where the board's law firm paid for the hearing officer in a termination hearing). Given that Johnson fails to articulate why Mair's representation violated her due process rights, and the relevant case law we have found goes against her, we hold that the district court did not err in dismissing this claim.[5]

## C.

In Count II of Johnson's first amended complaint and Count VII of her proposed second amended complaint, Johnson alleges that the City and Morales violated her procedural due process rights by suspending her business license before granting her a chance to be heard.

The Fourteenth Amendment prohibits states from depriving individuals of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. When evaluating a claim alleging a property deprivation without due process, we first determine whether due process applies. *See Morrissey*, 408 U.S. at 481. If it does, we then determine what process is due. *See id.* Johnson's interest in her business license is enough to invoke due process protection. *See Bell v. Burson*, 402 U.S. 535, 539 (1971); *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 486 (6th Cir. 2014). So we consider whether due process entitled her to a pre-suspension hearing.

It is the general rule that due process "requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (collecting cases). But there are exceptions to this rule. For example, "we have held that the failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United*

---

[5]Johnson also argues that the district court erred in concluding that she pleaded this claim in her first amended complaint and that it could dismiss the same claim in her proposed second amended complaint for the same reasons. Her argument lacks merit. The claims in both complaints are virtually identical. The only difference is that she lists the claim as a separate count in her proposed second amended complaint, whereas she lists it as a paragraph in Count I of her first amended complaint.

*Pet Supply*, 768 F.3d at 486 (collecting cases); *see also Spinelli v. City of New York*, 579 F.3d 160, 170 (2d Cir. 2009). And under the *Parratt* doctrine, "[c]ourts may dismiss a procedural due process claim if the state provides an adequate postdeprivation remedy" and the following conditions apply: "(1) the deprivation was unpredictable or 'random'; (2) the predeprivation process was impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2014) (quoting *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (per curiam)).

None of these exceptions apply to Johnson's case. Defendants do not contend that the decision to suspend Johnson's license was a "random" or "unauthorized" act. And Johnson specifically disputes that, at the time of the suspension, any type of emergency or exigent circumstance required the immediate suspension of her license.

But relevant here, we have said that "[t]he failure to provide a hearing prior to a license or permit revocation does not per se violate due process." *United Pet Supply*, 768 F.3d at 488 (citing *Barry v. Barchi*, 443 U.S. 55, 65–66 (1979)). Thus, the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), determines whether the government must provide some type of hearing before suspending a business license. *See Spinelli*, 579 F.3d at 170.

The *Mathews* test weighs three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263–71 (1970)).

*The Private Interest.* The Supreme Court has long recognized that an individual may have a significant interest in maintaining a license. *See, e.g.*, *Burson*, 402 U.S. at 539 ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood.").

More generally, the Court has "repeatedly recognized the severity of depriving someone of his or her livelihood." *FDIC v. Mallen*, 486 U.S. 230, 243 (1988).

In *Cleveland Board of Education v. Loudermill*, for example, a security guard sued the Cleveland Board of Education ("Board") for dismissing him after it discovered that he had falsely stated on his job application that he had never been convicted of a felony. 470 U.S. 532, 535 (1985). The Court held that the Board violated the security guard's due process rights by not providing him a "pretermination opportunity to respond" to the charges against him. *Id*. at 547. In so holding, the Court noted that "the significance of the private interest in retaining employment cannot be gainsaid" and that it had "frequently recognized the severity of depriving a person of the means of livelihood." *Id.* at 543 (collecting cases).

But the Court qualified this interest in *Gilbert v. Homar,* 520 U.S. 924 (1997). In *Gilbert*, the Court held that a state university did not violate a tenured police officer's due process rights when it suspended him without a pre-suspension hearing after he was charged with drug-related offenses. *See id.* at 926–27. While the Court acknowledged "the severity of depriving someone of the means of his livelihood," it explained that "account must be taken of 'the length' and 'finality of the deprivation[.]'" *Id.* at 932 (emphases omitted). The court reasoned:

> Unlike the employee in *Loudermill*, who faced termination, respondent faced only a temporary suspension without pay. So long as the suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all[.]

*Id.* (emphases omitted). *Gilbert* would seem to undercut the private interest in Johnson's case because Johnson received a hearing just three days after having her license suspended. That said, important differences between *Gilbert*'s facts and Johnson's well-pleaded allegations limit its relevance here.

First, unlike the suspension of the employee in *Gilbert*, who may have retained "fringe benefits such as health and life insurance" in his job, Johnson alleges that the suspension of her license "was specifically designed to destroy the commercial interests of [her] business." (R. 15-1, Proposed Second Am. Compl. at PageID #250 ¶ 27.) On appeal, Johnson elaborates that her license "means all or nothing for the continued operation of her southern soul food business."

(Johnson's Opening Br. at 22.)  It seems unlikely, therefore, that Johnson could have counted on the availability of "fringe benefits" to provide her a financial safety net while awaiting a final decision.

Second, roughly one month after his suspension, the employee in *Gilbert* resumed working for the university, although as a lower-paid groundskeeper, and he received backpay from the date his suspension took effect.  520 U.S. at 927.  In Johnson's case, the City took a little over two months to make its decision upholding the suspension of her business license.[6] And even if the City had ruled in Johnson's favor, the City has given no indication that she would have been entitled to any compensation for lost income attributable to the suspension.

Third, and finally, the Court assumed that the employee's lost income in *Gilbert* would be "relatively insubstantial" since the university had only suspended and not terminated him.  *Id.* at 925.  But it is unclear what difference it makes that the City suspended Johnson's license rather than revoked it.  We have not found (and Defendants have not cited) any authority that explains what the formal or practical difference is between a suspended license and a revoked license.  No provision in Saginaw's Code of Ordinances conveys that suspended licenses are any easier to renew than revoked licenses, for example.  Rather, a person who has had her license suspended or revoked may only renew her license by applying for a new license like someone seeking a license for the first time.  *See* § 110.07.

*The Government's Interest.*  We also accept that the government has a substantial interest in ensuring the safety of its citizens, especially where it concerns violent gang activity.  But in assessing the government's interest, we must consider "the fiscal and administrative burdens that [] additional or substitute procedural requirements would entail."  *Mathews*, 424 U.S. at 335. Given that the City held a hearing within three days of the shooting (after suspending Johnson's

---

[6]Contrary to the district court's opinion, the Supreme Court's precedents show that we measure the extent of the private interest from the time of the suspension to the time a decision has been reached in the post-suspension proceeding.  *See Mathews*, 424 U.S. at 342 ("Since a terminated recipient must first obtain a reconsideration decision as a prerequisite to invoking his right to an evidentiary hearing, the delay between the actual cutoff of benefits and final decision after a hearing exceeds one year."); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56 (1993) ("And even if the ultimate judicial decision is that the claimant was an innocent owner, or that the Government lacked probable cause, this determination, coming months after the seizure, would not cure the temporary deprivation that an earlier hearing might have prevented.") (internal quotation marks omitted).

license), it does not appear as though it would have been impractical for the City to have held a hearing before suspending her license.  *See James Daniel Good Real Prop.*, 510 U.S. at 59.

Nor would doing so appear to create an undue financial burden on the government. In *Mathews*, for instance, the Court found that the burden of requiring a pre-suspension hearing "would not be insubstantial" due, in part, to the expense of providing benefits to ineligible recipients pending decision.  424 U.S. at 347.  But here, the City loses no money by allowing Johnson to stay in business.  On the contrary, the financial risk of an erroneous decision is solely for her to bear.  So providing Johnson a pre-suspension hearing would likely not "have been unduly burdensome, especially given the property interest at stake, namely continued operation of business."  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 613 (6th Cir. 2006); *see also Freeman v. Blair*, 862 F.2d 1330, 1332 (8th Cir. 1988) (holding that the summary suspension of a business license violated due process, "especially in view of the fact that defendants have made no showing that a predeprivation hearing was impracticable or impossible").

*The Risk of an Erroneous Deprivation.*  Without a pre-deprivation hearing, due process generally requires some other way to ensure that reasonable grounds exist to support the deprivation of a property interest.  *See Gilbert*, 520 U.S. at 934; *Mallen*, 486 U.S. at 240 (collecting cases).

*Mathews* reasoned that a pre-deprivation hearing is more appropriate where "a wide variety of information may be deemed relevant, and issues of witness credibility and veracity [] are critical to the decisionmaking process."  424 U.S. at 343–44.  The flip side is that a pre-deprivation hearing is less appropriate where the decision turns "upon routine, standard, and unbiased" information.  *Id.* at 344 (internal quotation marks omitted).

Here, the decision to suspend Johnson's license based on her alleged failure "to maintain adequate security to prevent or discourage unlawful behavior" presumably turned on "a wide amount of information." (R. 5, Am. Compl. at PageID #54; R. 5-1, Am. Compl. Ex. A at PageID #61.)  We also know that the government presented witness testimony at her post-deprivation hearing and that the hearing had to be adversarial.  *See* § 110.06(D), (F).  Thus, we can infer that "issues of witness credibility and veracity" were critical in the decision to suspend her license.

A pre-deprivation hearing may also be unnecessary where some other pre-deprivation process ensures that reasonable grounds exist to support the deprivation. *See Gilbert*, 520 U.S. at 933–34. In *Gilbert*, that was accomplished by the employee's arrest and the filing of charges against him. *Id.* at 934. As the court noted, the arrest and charges ensured that the suspension was not "baseless or unwarranted" because "an independent third party ha[d] determined that there [was] probable cause to believe the employee [had] committed a serious crime." *Id.*; *see also Mallen*, 486 U.S. at 241 (noting that a hearing was not required before the government could suspend a bank official where "[a] grand jury had determined that there was probable cause to believe that [he] had committed a felony"); *Tanasse v. City of St. George*, 172 F.3d 63, 1999 WL 74020, at *4 (10th Cir. 1999) (table) (holding that the government did not violate due process in revoking a business license without a pre-deprivation hearing where "[t]he revocation followed directly from [the licensee's] conviction in a court of law, with all its attendant procedures and safeguards").

Here, in contrast, the City has not arrested or charged anyone for the shooting that prompted the suspension. Nor is there any other indication that the City had reasonable grounds to suspend Johnson's license without first affording her a pre-suspension hearing.**[7]** On the contrary, Johnson maintains that the decision to suspend her license is "premised on numerous faulty assumptions and lack of proof." (R. 15-1, Proposed Second Am. Compl. at PageID #253 ¶ 56.) Indeed, she alleges that the City decided to suspend her license rather than apprehend the individuals responsible for the shooting to "shift blame from its poorly-staffed and ineffective police department[.]" (*Id.* at PageID #250 ¶ 25.)

The government and private interests are both weighty. So this factor tips the *Mathews* balance in Johnson's favor. At this stage of the litigation, we cannot know whether the government ensured that there were reasonable grounds to suspend Johnson's license without affording her a pre-suspension hearing. And, under these circumstances, the value of a pre-suspension hearing in mitigating the risk of an erroneous deprivation was likely high. Thus, we

---

**[7]**The complaint makes a passing reference to an investigation that occurred between the time of Johnson's suspension and her initial administrative hearing. But given that this appeal comes to us on a motion to dismiss, we have no details of what that investigation consisted of and whether it ensured there were reasonable grounds to suspend Johnson's license.

hold that Johnson has stated a viable procedural due process claim based on the government's failure to provide her some type of hearing before suspending her license.

**D.**

In Count III of Johnson's first amended complaint and Count VIII of her proposed second amended complaint, Johnson alleges that section 110.06(D) of Saginaw's Code of Ordinances unconstitutionally places the burden on the licensee to show her suspension is unwarranted. Unlike the majority, I do not read Johnson's complaint as an as-applied challenge. Because Johnson's argument is a facial challenge to the ordinance, she must show that "no set of circumstances exists under which the [ordinance] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). So I respectfully depart from the majority's conclusion that the ordinance offends due process.

Johnson does not explicitly label her claim a facial challenge but nearly all of her allegations concern the ordinance's application generally. Only one allegation mentions the ordinance's application to her own hearing. (*See* R. 15-1, Proposed Second Am. Compl. at PageID #261 ¶ 136 (alleging that the ordinance "result[ed] in a set of circumstance[s] whereby Defendant Timothy Morales and/or Defendant City of Saginaw never had to legally support or prove the soundness or correctness of the immediate suspension").) But this allegation is more appropriately viewed as a challenge to the reasonableness of Jordan's decision. And we consider that challenge in our review of Johnson's substantive due process claim.

Either way, section 110.06 seems to place at least some, if not the entire, burden of proof on the licensee at the first post-suspension hearing. That reading is based on sections 110.06(C) and 110.06(D). The former requires the City Manager to notify the licensee to "show why"—at the hearing—her license should not be suspended. The latter reiterates that the licensee shall "show cause" for why the license or permit should not be suspended at her hearing. I say "some" because section 110.06(A) only authorizes the City Manager to suspend a license "for cause." And section 110.06(B) provides a non-exhaustive list of what constitutes "cause." So section 110.06 could be read as placing at least a preliminary burden of proof on the City Manager, with the burden swinging back to the defendant at some point in the hearing. In any

event, the parties do not dispute that the ordinance places the burden of proof on the licensee. So I agree with the majority that Johnson plausibly alleges the burden shifted to her, the licensee. But I do not believe that section 110.06 violates due process on its face. As a result, I depart from the majority's position that the statute, as applied, violates due process.

The Supreme Court has said several times that outside the context of the criminal law, "where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005) (quoting *Lavine v. Milne*, 424 U.S. 577, 585 (1976)).

And the cases Johnson cites do not contravene that general rule. Some are cases involving statutes that created irrational presumptions of ultimate facts based on facts proven. *See W. & A.R.R. v. Henderson*, 279 U.S. 639, 644 (1929); *Minski v. United States*, 131 F.2d 614, 616 (6th Cir. 1942). But section 110.06(D) does not establish any such presumption. It only requires the licensee to "show cause" why her license should not be suspended. Other cases that Johnson cites address the burden of proof in a criminal proceeding. *See Patterson v. New York*, 432 U.S. 197, 210 (1977); *In re Winship*, 397 U.S. 358, 363 (1970). But her proceeding was not criminal. Johnson also cites *Speiser v. Randall*, 357 U.S. 513 (1958), where the Court held that requiring claimants seeking tax exemptions to show they did not advocate for the violent overthrow of the government violates due process. *Id*. at 529. There, however, it was essential that the law operated as a restraint on free speech. *See id*. at 526 ("Where the transcendent value of speech is involved, due process certainly requires in the circumstances of this case that the State bear the burden of persuasion . . . ."). Here, Johnson does not allege that section 110.06(D) restrains any speech. Nor is there any indication on its face that it does.

Even *Speiser* acknowledged that it is generally "within the power of the State to regulate . . . the burden of producing evidence and the burden of persuasion . . . ." *Id*. at 523. And we have stated that shifting the burden of proof to the responding party in a quasi-judicial proceeding, like Johnson's suspension hearing, does not implicate due process concerns. *See In re Cook*, 551 F.3d 542, 552 (6th Cir. 2009).

Consistent with these authorities, I would hold that section 110.06(D) does not violate due process by placing the burden of proof on the licensee at the first post-suspension hearing.

**E.**

Having considered each of Johnson's claims that overlap both of her complaints, we now turn to the claims that she alleges exclusively in her proposed second amended complaint.

In Count I of her proposed second amended complaint, Johnson challenges the constitutionality of section 110.06(E).[8] That ordinance regulates the process by which a licensee can appeal the suspension or revocation of her license after her initial post-suspension hearing. *See* § 110.06(E).

First, Johnson argues that section 110.06(E) violates due process because it permits the appointment of "non-detached, non-neutral decision makers . . . by a direct supervisor who has the ability to fire each arbiter from their regular jobs at the City of Saginaw." (R. 15-1, Proposed Second Am. Compl. at PageID #254 ¶ 75(a).) But her argument depends on the same "command influence" theory we rejected above. (*See* Johnson's Opening Br. at 32.) And it is similarly unavailing here.

Second, Johnson argues that section 110.06(E) is unconstitutional because it allegedly permits "[t]he appointment of panelists who [] lack [the] training, experience, and/or education to understand and properly adjudicate the factual and legal arguments placed before them." (R. 15-1, Proposed Second Am. Compl. at PageID #255 ¶ 75(b).) As the district court noted, Johnson seems to argue that due process entitled her to a panel consisting of attorneys or other persons with sophisticated legal knowledge. Johnson disputes this in her opening brief, yet she still argues that the members of her hearing panel "[were] supposed to be able to know the rules of statutory construction, the rules of vagueness, [and] constitutional standards." (*See* Johnson's Opening Br. at 34.)

---

[8]Again, Johnson is unclear about whether she is challenging the ordinance on its face or as applied to her case. In any event, if she is arguing that the ordinance is facially unconstitutional, her claim necessarily fails because she cannot show that the ordinance was applied unconstitutionally to her. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 194 (6th Cir. 1997) ("[A] facial challenge to a statute should fail if the statute has a constitutional application.").

Johnson cites no legal authority to support her argument, but we find *Morrissey* instructive.  There, the Court held that due process does not require decisionmakers in parole-revocation hearings to be lawyers or judicial officers.  *See Morrissey*, 408 U.S. at 486, 489. It reasoned that "granting and revocation of parole are matters traditionally handled by administrative officers."  *Id*. at 486.

Likewise, the City's ordinances do not suggest that persons with sophisticated legal knowledge are involved in the decision to approve an application for a business license.  Instead, officials like the City's police chief, fire chief, and health officers participate in that decision. § 110.04(D)–(E).  So, as in parole-revocation decisions, the decision to grant a business license in Saginaw is a matter "traditionally handled by administrative officers."  We thus hold that due process did not require Johnson's appeal panel to consist of persons with sophisticated legal knowledge.

Third, Johnson argues that section 110.06(E) unconstitutionally granted the appeal panel "unstructured, unlimited, and arbitrary discretion to determine whether to affirm or [reverse]" Jordan's decision upholding the suspension order.  (R. 15-1, Proposed Second Am. Compl. at PageID #255 ¶ 75(c).)  By its plain terms, section 110.06(E) does no such thing.  Rather, it provides that "[t]he factual record made in the hearing [below], or license or permit application . . . shall constitute the basic record for the appeal."  § 110.06(E).  It also states that oral argument "as to the relevant factual and legal issues shall be permitted[,]" and that the panel may allow "the presentation of additional evidence by a majority vote."  *Id.*

True, section 110.06(E) does not specify what standard of review the panel should apply. But due process does not regulate state administrative procedure in such granular detail.  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *See, e.g.*, *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manso*, 380 U.S. 545, 552 (1965)).  Johnson concedes that Morales provided her notice of her license suspension and that she had two opportunities to respond—the first at the initial hearing and the second at the appeal hearing.  Section 110.06(E) details procedures to facilitate a meaningful opportunity for the licensee to be heard before the appeal panel, while section 110.06(D) specifies even more extensive procedures regulating how the initial hearing is to be conducted.

*See* § 110.06(D)–(E). And Johnson does not allege that she was denied any process these ordinances entitled her. We are thus satisfied that Johnson's appeal was conducted in accordance with the minimum requirements of due process.

Fourth, and last, Johnson argues that section 110.06(E) is unconstitutional because of the "lack of any requirement of (or the failure of actually providing) a written statement by the appeal board panelists as to the reasons for their affirmance vote." (Johnson's Opening Br. at 31). Even if we assume that the appeal panel needed to provide her a written statement, *see Morrissey*, 408 U.S. at 489, her argument misses the mark for a few reasons.

Section 110.06(E) states that "the decision of the appeal panel shall be reached by majority vote and *mailed* to the parties within seven days of the conclusion of the hearing." § 110.06(E) (emphasis added). So the ordinance contemplates that the appeal panel will prepare a written statement of its decision because it requires the decision to be mailed to the licensee. And contrary to her allegation, the record reveals that Johnson received a written statement of the panel's decision explaining that it was affirming the decision to suspend Johnson's license.[9]

Granted, the statement does not detail its reasons for affirming the decision. This was not the only written statement that Johnson received, however. Section 110.06(D)(10) requires that the hearing officer at the initial administrative hearing "make written findings of fact based upon the competent evidence and testimony admitted during the hearing." § 110.06(D)(10). And Johnson concedes that she received Jordan's written findings of fact on July 14, 2017. Johnson has not established that she was entitled to any more due process than what she received at her initial hearing. So her due process rights were not violated just because the appeal panel did not thoroughly explain why it was affirming Jordan's decision.

**F.**

In Count II of her proposed second amended complaint, Johnson alleges that section 110.06(F) of Saginaw's Code of Ordinances is unconstitutionally vague both on its face and as

---

[9]Defendants attached this document to their response to Johnson's motion for leave to file her second amended complaint. Although courts seldom consider factual information outside the complaint, the district court properly considered this document since it was "referred to in the Complaint and [is] central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

applied to her case.   Section 110.06(F) provides for the immediate suspension of a business license where the City Manager or his designee determines that such a suspension is necessary and "in the interest of the public health, morals, safety, or welfare . . . ."  § 110.06(F).  Johnson argues that the ordinance gives the City Manager authority "to exercise the entirety of all state police power in the manner, mode, and interpretation he sees fit," and so "fails to put Johnson on notice" of what conduct is proscribed.  (*See* Johnson's Opening Br. at 39.)  But because Johnson does not claim that the Ordinance implicates her First Amendment rights, and the Ordinance does not impose criminal sanctions,[10] she only has standing to challenge its purported vagueness as applied to the facts of her case.  *See New York v. Ferber*, 458 U.S. 747, 767–69 (1982); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999).

"A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).  That said, the Supreme Court has made clear that the void for vagueness doctrine is applied less strictly to economic regulations.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99 (1982).[11]

Moreover, our own court has upheld the validity of laws challenged on vagueness grounds that are phrased similarly to section 110.06(F).  For example, we held that a statute prohibiting persons from discharging substances into state waters that are or may "become

---

[10]To be sure, section 110.99 provides that the violation of any provision of Chapter 110 of Saginaw's Code of Ordinances constitutes a civil infraction and imposes a civil fine on offenders.  *See* § 110.99.  But even if the sanction were criminal, a licensee would presumably only be sanctioned for continuing to operate a business after its license had been suspended, not because the City Manager suspended the business under section 110.06(F).

[11]The Supreme Court justified subjecting economic regulation to a less strict vagueness test on these grounds:

> [I]ts subject matter is often more narrow, and . . . businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.  The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.

*Village of Hoffman Estates*, 455 U.S. at 498–99.

injurious to the public health, safety, or welfare" was "sufficiently specific to provide a fair warning that certain kinds of conduct are prohibited." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1441 (6th Cir. 1991) (citations omitted). And the statute in *Akzo* contained three of the four terms that Johnson argues make section 110.06(F) vague: "health," "safety," and "welfare."

And our decision in *Fowler v. Bd. of Educ. of Lincoln Cty.*, 819 F.2d 657 (6th Cir. 1987), clarifies that the fourth term that Johnson challenges—morals—does not make the ordinance void for vagueness. There, we concluded that a Kentucky statute proscribing "conduct unbecoming a teacher" was not unconstitutionally vague as applied to a teacher who "had a fifteen-year-old student show a controversial, highly suggestive and somewhat sexually explicit movie to a group of high school students aged fourteen to seventeen." *Id.* at 665. In so holding, we noted that some of the "most conscientious of codes that defined prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'" *Id.* (quoting *Arnett v. Kennedy*, 416 U.S. 134, 161 (1974)).

Our decisions in *Akzo* and *Fowler* show that a person of "ordinary intelligence" would understand that section 110.06(F) applies when gangsters shoot at and into a person's business. This type of conduct plainly concerns the "health," "safety," or "welfare" of the residents of Saginaw. So Johnson should have been on notice that the City could have suspended her license in the wake of such gang violence to safeguard those interests. We therefore hold that section 110.06(F) is not unconstitutionally vague as applied to Johnson's case.

## G.

In Count III of Johnson's proposed second amended complaint, Johnson alleges a selective enforcement claim against Defendants. In support of her claim, she alleges that the City did not suspend or revoke the licenses of two other businesses where shootings occurred.

To succeed on a selective-enforcement claim, a plaintiff must prove that (1) he or she belongs to an identifiable group singled out for prosecution even though the state actor did not "prosecute persons not belonging to that group in similar situations"; (2) the state actor prosecuted the person with a discriminatory purpose; and (3) the prosecution had

"a discriminatory effect on the group [] the [plaintiff] belongs to." *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 394–95 (6th Cir. 2016) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)). Johnson fails to allege facts that, taken as true, would satisfy any of these elements.

Johnson has not alleged that the City singled her out for belonging to an identifiable group. Although she claims her suspension was based on an "unjustifiable standard premised on arbitrary classification," (R. 15-1, Proposed Second Am. Compl. at PageID #257 ¶ 94), this is a conclusory assertion that does not identify her as belonging to any specific group. Johnson has also not alleged that the City initiated its enforcement action with a discriminatory purpose or that the City's enforcement action had a discriminatory effect on any group to which she belongs.

Even so, the majority construes Johnson's claim as an equal protection claim based on the "class-of-one" theory recognized in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). In *Olech*, the Court stated that such a claim could be brought "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id*. at 564.

The majority concludes that Johnson has plausibly alleged a class-of-one claim. I respectfully disagree. Before I explain why, I pause to question whether such a claim is even cognizable here. In *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008), the Court held that class-of-one claims are not cognizable in the public-employment context. A substantial part of its reasoning, worth quoting at length, appears applicable to this case:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id*. at 603.

The Court's reasoning suggests that class-of-one claims are not cognizable where the relevant state action "involve[s] discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* And the Court signaled that its holding would apply outside the public employment context when it offered a non-employment hypothetical involving a traffic officer. *See id.* at 603–04. In that hypothetical, the officer tickets just one speeding car on a busy highway even though not every offender can be ticketed, and the offenders are indistinguishable from one another. *Id.* The Court explained that "allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action." *Id.* at 604. More pithily, the Court put it: "It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." *Id.*

The City's decision to suspend Johnson's license is exactly the type of "subjective, individualized decision" contemplated by *Engquist*. We need only look to the examples Johnson discusses in her complaint to see why.

The first example describes a shooting at Dom's Food Market, a liquor store in Saginaw, where Johnson alleges that a man was killed and that the "gun fire exceed[ed] the damage caused at [Johnson's] property." (R.15-1, Second Am. Compl. at PageID #256 ¶ 91.) The second describes a shooting at a Saginaw hospital where a patient fired a single gunshot and nobody was injured.

The reasons why the City might have chosen to suspend Johnson's license but not the licenses of these businesses are many. But take just a few: (1) There is no indication that the shootings at the liquor store or hospital were gang-related, and "[t]he City . . . could rationally conclude that gang-related violence is substantially more likely to recur than other gun-violence." (R. 20, Op. and Order at PageID #394.); (2) the risk of mass casualties could be higher at Johnson's business than at Dom's Food Market because idle patrons enjoying a meal are probably easier targets than those simply passing through a liquor store; (3) the previous risk is even greater in Johnson's case because she often rents out her restaurant to private parties seeking event space; (4) only one gunshot was fired at the hospital while several were fired at

Johnson's restaurant; and (5) any security benefits gained from suspending the hospital's business license may have been outweighed by the public health benefits lost because of suspension. The list goes on and on.

Something else should be apparent by now. Johnson can't plausibly allege a class-of-one claim even if it is cognizable. Recall Johnson's burden under rational-basis review. As relevant here, Johnson must "negat[e] every *conceivable basis* which might support the government action[.]" *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012) (emphasis added) (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006)). But as the preceding list shows, she plainly can't do that. And that makes sense. If a decision is truly subjective and individualized, there are any number of rational (if not wise) bases that might support the decision. For these reasons, I would hold that Johnson has failed to state a plausible, if even cognizable, equal protection claim.

**H.**

In Count V of Johnson's proposed second amended complaint, she alleges that her due process rights were violated because Jordan "had secret, ex parte communications with Chief Ruth" about her case outside her or her counsel's "presence or knowledge." (*See* R.15-1, Second Am. Compl. at PageID #258 ¶ 1123.) To support her claim, she attaches an email chain (obtained through FOIA requests) that shows Jordan asking Ruth whether Ruth has any notes or written agreements relating to a meeting Ruth attended with Johnson. Ruth responded that he had no such documentation and that he was unsure if anyone else who attended the meeting did. (*Id.*) The email also shows that Ruth copied the City's Office of Management and Budget director in his response to Jordan. The director responded that she did not "document anything," although she remembered attending the meeting. (*Id.* at PageID #294.) She also stated that she had forwarded Jordan's email to two other individuals who may have had notes from the meeting.

On appeal, Johnson relies only on *Morrissey* for the proposition that minimal due process entails the "right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." (Johnson's Opening Br. at 41.)

But *Morrissey* examined what process was due in the context of a parole-revocation hearing. *See* 408 U.S. at 489. It did not purport to set forth the minimum requirements of due process in every type of state and local administrative hearing.

Even if *Morrissey* applies here, Johnson does not allege that she was denied the right to confront and cross-examine adverse witnesses at her hearing. Indeed, the suspension order informed Johnson that she could "cross-examine any witnesses and examine all evidence" at her hearing. (R. 15-1, Proposed Second Am. Compl. at PageID #267.) And nothing in her complaint alleges that she was denied that opportunity.

Outside the context of a criminal proceeding, few cases address the permissible scope of ex parte communications under the Due Process Clause. But the cases we have found suggest that hearing officers in local administrative proceedings do not violate due process when they have ex parte communications, especially absent a showing of prejudice. *See, e.g.*, *Massman Constr. Co. v. Tenn. Valley Auth.*, 769 F.2d 1114, 1126 (6th Cir. 1985); *Stone v. FDIC*, 179 F.3d 1368, 1377 (Fed. Cir. 1999).

None of the ex parte communications Johnson attaches to her complaint reveal she was prejudiced by such communications. Nor does she allege that there are other ex parte communications that would show this prejudice. The communications she attaches merely show Jordan seeking to confirm whether Ruth or others had documented a certain meeting with Johnson. And the communications suggest that Ruth had already described the meeting at Johnson's hearing, where she presumably had a chance to cross examine him. We therefore hold that Jordan's alleged ex parte communications did not violate Johnson's due process rights.

**I.**

Last, in Count IX of Johnson's proposed second amended complaint, Johnson alleges a substantive due process claim. Essentially, she claims that the City's decision to suspend her license "due to the illegal actions of third parties [is] arbitrary and capricious," so it violates substantive due process. (R. 15-1, Proposed Second Am. Compl. at PageID #262.)

"To establish a violation of substantive due process, a plaintiff must first establish the existence of a constitutionally-protected property or liberty interest." *Silver v. Franklin Twp., Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992). Johnson has such an interest in her business license. *See United Pet Supply*, 768 F.3d at 486.

Next, "a plaintiff must show that the state administrative agency has been guilty of 'arbitrary and capricious action' in the *strict* sense[.]"[12] *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (quoting *Stevens v. Hunt*, 646 F.2d 1168, 1170 (6th Cir. 1981)). This means that the plaintiff must show that the administrative decision "is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Id.* (internal quotation marks and alterations omitted).[13]

---

[12]The use of the phrase "arbitrary and capricious" in the context of substantive due process is slightly confusing, given its more familiar and common usage in the context of agency action in administrative law. But it is clear that our cases regard "arbitrary and capricious" as used in the substantive due process context as a stricter standard to meet. *Compare Maple Drive Farms Ltd. P'ship v. Vilsack*, 781 F.3d 837, 851 n.22 (6th Cir. 2015) (noting that, in federal administrative law, "arbitrary-and-capricious" review and "substantial-evidence" review "have a tendency to converge, and the difference between the two is 'largely semantic'") (alteration omitted) *with Pearson*, 961 F.2d at 1221 (6th Cir. 1992) (explaining that, in the context of substantive due process, "arbitrary and capricious" review is "much narrower" than "substantial evidence" review).

[13]The majority contends that Johnson's substantive due process claim can succeed under *Pearson* even if the City had a factual basis for shuttering Johnson's business. To make that argument, they claim "[s]ubstantive due process . . . may be violated even if the state-defendant commits no factual error." *Infra* 33 n.4. Yet the language of *Pearson* does not easily accord with the majority's conclusion. *Pearson* provides just two ways that a state's administrative action may violate substantive due process: the state action will be upheld *unless* it is (1) "not supportable on any rational basis" or (2) a "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Pearson*, 961 F.2d at 1221 (internal quotation marks omitted). So we must travel one of these two paths to find that the City violated Johnson's substantive due process rights.

Thus, assuming the City had a factual basis for its actions, it could have only violated Johnson's substantive due process rights by acting irrationally. Under *Pearson* generally, it is "extremely rare for a federal court properly to vitiate the action of a state administrative agency as a violation of substantive due process." *Id.* at 1222. And

In *Pearson*, we characterized the degree of irrationality a plaintiff must show as "extreme irrationality" that "shocks the conscience." *Id.* at 1222. We also emphasized the limited scope of our review. While we said we could look at the evidence underlying the administrative decision, we also said the decision could "not be set aside as arbitrary and capricious if there is 'some factual basis' for the administrative action." *Id.* (quoting *Evans v. Page*, 516 F.2d 18, 21 (8th Cir. 1975)). And we held that the application of these standards was "a matter of law for the court." *Id.*[14]

I cannot conclude that the City's decision to suspend Johnson's license lacks a factual basis. At this stage of the litigation, we must accept all of Johnson's well-pleaded allegations in her complaint as true—and I do. According to Johnson, the City decided to suspend her license after gangsters shot at and into her restaurant one night. She thus concedes that there was "some factual basis" underlying the City's decision to suspend her license.

What Johnson really contests is whether the decision to suspend her license based on *that* fact is arbitrary and capricious. In other words, Johnson contends that the City's decision to suspend her license "due to the illegal actions of third parties [is] arbitrary and capricious." (R. 15-1, Proposed Second Am. Compl. at PageID #262; *see also* Johnson's Opening Br. at 48 ("*Permanently* destroying Johnson's restaurant and cafe business because of the acts of third

---

substantive due process violations should be even rarer, perhaps nonexistent, when the government provides a factual basis for its action. *Id.* ("The state decision may not be set aside as arbitrary and capricious if there is some factual basis for the administrative action.") (internal quotation marks omitted).

Even so, the majority interprets *Pearson* to permit finding a substantive due process violation for a "willful and unreasoning act," even if the government offers a factual basis for its decision. That's not what *Pearson* says. But that misreading stems from the majority's premise that *Pearson* recognizes "various contexts" for substantive due process violations. *Infra* 33n.4. Yet this ignores how *Pearson* repeatedly insists on strict and limited substantive due process inquiries. And *Pearson* also relies on a framework that defers to fact-based state actions. So the majority's broad interpretation of *Pearson* conflicts with our precedent. I respectfully disagree with that approach.

[14]We should read *Pearson* narrowly. Otherwise we risk subjecting every state administrative decision to federal court review. And that would turn our system of separated powers and dual sovereignty on its head. Out of concern for this risk, courts have generally limited such challenges to a narrow set of situations, including: self-dealing or corruption on the part of a state official; disparate treatment based on racial or ethnic status or constitutionally protected activity; and "conduct which is intentionally injurious and knowingly committed without justification." 12 Bus. & Com. Litig. Fed. Cts. § 127:8 (4th ed. 2018) (internal quotation marks omitted); *see also Bell v. Ohio State Univ.*, 351 F.3d 240, 251 (6th Cir. 2003) ("Where . . . there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process.").

party criminals is and has to be *the epitome* of the violation of substantive due process.").)
In *Pearson*, however, we were clear that the inquiry into whether a state's administrative decision is arbitrary and capricious and whether the decision has some factual basis in the record is the same. 962 F.2d at 1222.

Johnson concedes that the City had a factual basis for suspending her business license—that a violent, gang-related shooting occurred on her restaurant's premises. And the City's decision to suspend her license based on that fact cannot be characterized as an instance of "extreme irrationality." *See Tri-Cty. Concrete Co. v. City of N. Royalton*, 181 F.3d 104, 1999 WL 357789, at *3 (6th Cir. 1999) (table) ("Municipal defendants do not act with 'extreme irrationality' if there is evidence in the record that supplies a reason why they might have taken the action they did." (internal quotation marks omitted)). Nor is it a decision so irrational as to "shock the conscience." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012) (equating behavior that would "shock the conscience" to "behavior . . . so shocking as to shake the foundations of this country").

The majority attempts to distinguish these cases on their facts. What the majority does not and likely cannot do is cite a single Sixth Circuit case that applies *Pearson* to hold that government action violates substantive due process. That is because, until today, we do not appear to have ever done so. I doubt it is wise to start in a case where the plaintiff concedes that the government had "a reason why [it] might have taken the action [it] did." *Tri-Cty. Concrete Co.*, 1999 WL 357789, at *3 (internal quotation marks omitted). But, at the end of the day, it is unsurprising that three judges can't agree on questions like whether government action is "so shocking as to shake the foundations of this country." *EJS Properties*, 698 F.3d at 862. For a doctrine that, at times, evokes as much clarity as the phrase "green pastel redness,"[15] that is par for the course.

Respectfully, I dissent.

---

[15] John Hart Ely, *Democracy and Distrust* 18 (1980).

## V.

For these reasons, and the reasons expressed in the separate majority opinion, we AFFIRM the judgment of the district court except on Johnson's claims that Defendants violated her: (1) rights to procedural due process by denying her a pre-suspension hearing; (2) rights to procedural due process by shifting to her the burden of showing cause; (3) rights to equal protection based on her class-of-one theory; and (4) rights to substantive due process.[16] For those claims, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.

---

[16]As for Johnson's motion seeking leave to file her second amended complaint, our opinion is limited to the district court's denial of that motion on futility grounds.

_____

**OPINION/CONCURRENCE**

_____

HELENE N. WHITE, Circuit Judge.  I write separately to express the majority view with respect to Johnson's claims (1) that the ordinance shifted the burden to her in violation of due process; (2) that the City's suspension of her license violated her substantive-due-process rights; and (3) that the City and Timothy Morales violated her right to equal protection under a "class of one" theory.  First, because Johnson plausibly alleges an as-applied procedural-due-process violation stemming from the combination of the absence of a pre-deprivation hearing and a presumption that Morales's decision was correct, we reverse the district court's dismissal of Johnson's burden-shifting claim.  Second, we reverse the district court's denial of Johnson's motion for leave to amend to add a substantive-due-process claim because Johnson's proposed complaint plausibly alleges that the City acted arbitrarily and capriciously.  Finally, we reverse the district court's denial of leave to amend to add a selective-enforcement or class-of-one equal-protection claim because Johnson's proposed complaint plausibly alleges that the City treated her business differently from other similarly situated businesses without a rational basis.

**I.**

Johnson claims that § 110.06(D) of Saginaw's Code of Ordinances operated to violate her due process rights by authorizing the immediate suspension of her business license and shifting the burden to her to show cause why her license should not be suspended.  We conclude that Johnson has plausibly alleged that such burden-shifting, as applied here, violated her right to procedural due process.[1]

_____

[1]Although many of Johnson's allegations concern the ordinance's application generally, she alleges in both her first and proposed second amended complaint that the ordinance unconstitutionally placed the burden on her to "prove actual innocence" on Morales's findings, "thereby resulting in a set of circumstance[s] whereby Defendant Timothy Morales and/or Defendant City of Saginaw never had to legally support or prove the soundness or correctness of the immediate suspension."  R. 5, First Am. Compl. at PID 57 ¶ 76; R. 15-1, Second Am. Compl. at PID 261 ¶ 136.  We conclude that these allegations challenge the constitutionality of the ordinance as applied to Johnson's license suspension.

Section 110.06(A) of Saginaw's Code of Ordinances permits the City Manager to "suspend, revoke, or deny renewal of a license for cause." As made clear by § 110.06(C), in the usual course, a license is not immediately suspended or revoked until after the licensee has been afforded notice of the charges and an opportunity to respond. Here, however, the City acted pursuant to § 110.06(F), which allows the City Manager to immediately suspend a license "in the interest of the public health, morals, safety, or welfare." The Suspension Order listed the following in support of the immediate suspension:

(1) serious and violent criminal activity generated by the operation of this establishment;

(2) the aforementioned serious and violent criminal activity has resulted in significant injury to persons and damage to property;

(3) the aforementioned serious and violent criminal activity has occurred as recently as Saturday, May 6, 2017;

(4) the aforementioned serious and violent criminal activity constitutes a hazardous condition contrary to the health, morals, safety and welfare of the public;

(5) failure to maintain adequate security to prevent or discourage unlawful behavior.

R. 5-1, PID 61. Johnson contends that the City's ordinance provisions—allowing for suspension without a hearing followed by a requirement that the licensee carry the burden of showing that the suspension should be overturned—resulted in a situation where Morales's decision was presumed to be correct and the City was never required to support or justify its original decision to suspend Johnson's business license.

Although "the requirements of due process are fluid and fact dependent," *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015), "[t]he point of procedural due process is to 'require procedural fairness and to prohibit the state from conducting unfair or arbitrary proceedings,'" *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 606 (6th Cir. 2016) (quoting *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 740-41 (6th Cir. 2015)). In order to effectuate those goals, due process requires that an aggrieved party be afforded a hearing conducted "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). We have held that these requirements are not satisfied simply because a hearing took place. *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 427 (6th Cir. 2017).

Rather, we look to the "substance, not to bare form, to determine whether constitutional minimums have been honored." *Bell v. Burson*, 402 U.S. 535, 541 (1971).

Johnson has plausibly alleged that the City's ordinance deprived her of a meaningful opportunity to challenge her suspension. The City Manager invoked § 110.06(F) to immediately suspend Johnson's license after determining that an immediate suspension was in the interest of the public health, morals, safety, or welfare. But at no point was the City required to justify that initial decision. Johnson alleges—and the City appears to concede—that the ordinance placed the burden on Johnson to show that her business did not threaten the public health, morals, safety, or welfare.[2] That allegation is consistent with the text of the ordinance, which suggests that the post-deprivation hearing that was afforded to Johnson was limited to allowing her to show cause why her license should not be suspended for an additional period (or revoked)— rather than on whether the City Manager demonstrated the requisite cause. *See* § 110.06(F) (providing that the immediate suspension order must state the charge against the licensee and "order the licensee . . . to show why their license or permit should not be suspended for an additional period of time or revoked").

Thus, Johnson plausibly alleges that by depriving her of a pre-deprivation hearing and requiring her to bear the burden of proving that her business was not a threat to the public health, morals, safety, or welfare, the ordinance created a situation where Johnson's vested property

---

[2]We note that the "normal default rule" places the burden of proof on the party seeking relief. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005); *Campbell v. United States*, 365 U.S. 85, 96 (1961). As the district court properly found, the City is appropriately construed "as the party seeking affirmative relief (a change in the status quo)" in this case because Johnson "has a property interest in the license and it was suspended without prior hearing." Op. & Order, R. 20, PID 385 n.6. The Supreme Court has been skeptical of regulations that seek to place the entire burden of proof on the opposing party. For instance, the Court has noted that "[d]ecisions that place the *entire* burden of persuasion on the opposing party at the *outset* of a proceeding . . . are extremely rare." *Schaffer*, 546 U.S. at 57 (emphasis in original). Although the Court has cautioned that, "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment," *Lavine v. Milne*, 424 U.S. 577, 585 (1976), it has recognized that burden-shifting can be a problem of constitutional dimension in the civil context. For instance, in *Speiser v. Randall*, 357 U.S. 513, 525-26 (1958), the Court invalidated a California procedure under which taxpayers had the burden of demonstrating that they were not individuals who advocated the overthrow of the government in order to qualify for tax exemptions. The Court was particularly concerned that the burden-shifting in *Speiser* led to situations where "the possibility of mistaken factfinding" created the danger that legitimate conduct would be penalized. 357 U.S. at 526. Here, the fact-laden nature of the inquiry and the generality of a standard based on "the interest of the public health, morals, safety, or welfare" make it plausible that placing the burden of persuasion on Johnson impermissibly heightened "the possibility of mistaken factfinding" and created the danger that her valid property interest in her business was illegitimately jeopardized.

interest in her business license could be revoked without any proof, but reinstated only if Johnson proved that her business was not a danger to the health, morals, safety, or welfare, of the city; and that such a system unfairly jeopardized Johnson's property interest in her means of livelihood, an interest that this court and the Supreme Court have recognized as "one of the most significant that an individual can possess." *Ramsey v. Bd. of Educ. of Whitley Cty.*, 844 F.2d 1268, 1273 (6th Cir. 1988) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985)). Given the nature of the right involved,[3] a post-deprivation hearing in which the suspension is presumed to be warranted and Johnson bore the burden to prove the opposite fails to provide the meaningful procedure mandated by due process.

We emphasize that our holding is narrow. Due process does not require that the burden of proof always be placed on the party seeking relief. However, due process does require a meaningful opportunity to be heard in order to "prevent, to the extent possible, an *erroneous* deprivation of property." *Garcia*, 782 F.3d at 741. Johnson has plausibly alleged that the procedures afforded to her here fell short of those requirements. Accordingly, we reverse the district court's order dismissing Johnson's burden-shifting claim.

## II.

To prevail on her proposed substantive-due-process claim, Johnson must show "that there is no rational basis" for the City's decision to suspend her business license. *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992).[4] In its Suspension Order, the City purported to suspend Johnson's license based upon factual findings that (1) it was Johnson's business that

---

[3]As the Court noted in *Speiser*, "the more important the rights at stake the more important must be the procedural safeguards surrounding those rights." 357 U.S. at 520-21.

[4]The dissent would affirm the denial of leave to amend on Johnson's substantive-due-process claim largely on the basis that the City had a factual basis for shutting down her business. According to the dissent, the factual basis for closing Johnson's business was that unknown members of a gang shot into her restaurant, which Johnson does not dispute. The dissent concludes that this ends the discussion because it provides "some factual basis." *Pearson*, however, did not state that substantive due process is violated only if there is no factual basis for the decision. *Pearson* described at length the various contexts in which courts have found that substantive due process is violated—including that the action was "willful and unreasoning," "shocks the conscience," was "extreme[ly] irrational[]," or lacks "some factual basis." *Id.* at 1221-22. Substantive due process thus may be violated even if the state-defendant commits no factual error. Moreover, Johnson's allegations that her business was not the cause of the violence, that the perpetrators were unaffiliated with her business, and that the shooting was random rebut the City's purported factual bases for suspension, so Johnson has plausibly alleged that the City lacked a factual basis as well.

was causing or "generat[ing]" the violence, and (2) she failed to take adequate measures to prevent that violence. R. 5-1, PID 61. Likewise, on appeal, Defendants contend that the suspension was rational "to protect the health and safety of the Plaintiff and the citizens of Saginaw from the violent activity that was taking place *in connection with* Plaintiff's business." Appellee Br. at 33 (emphasis added). However, Johnson alleges that her business was not the cause of the violence, that the perpetrators were unaffiliated with her business, and that the shooting was random.

Suspending Johnson's business license because of unlawful acts of unaffiliated persons of which she had no prior notice qualifies as extremely irrational. The City's action is only rationally related to promoting public health, morals, safety, or welfare if it somehow deters or prevents conduct that threatens those interests. Thus, suspending Johnson's license is rational only if Johnson and her business somehow caused or contributed to the violence. Johnson plausibly alleges that she and her business were not the cause of the shooting, and that shutting down her business lacks any relation to promoting the public health, morals, safety, or welfare. The district court concluded that "[b]ecause gang-violence can be systemic and often centers around the same geographic areas, the City's decision to eliminate one potential location for repeated violence was rational." R. 20, PID 399-400. However, this "eliminating one potential location" rationale faults the restaurant's mere existence, and therefore could apply to any business operating in the City. Such a result is not rational. *Cf. Paterek v. Vill. of Armada*, 801 F.3d 630, 648-49 (6th Cir. 2015) (reversing summary judgment for defendants on plaintiffs' substantive-due-process claim because a reasonable jury could find that defendants arbitrarily and capriciously deprived plaintiffs of a recognized property interest).

The cases cited by the dissent are distinguishable. In the first case, *Tri-County Concrete Co. v. City of North Royalton*, a concrete company alleged that the defendant city deprived it of substantive due process by refusing to permit it to construct a concrete recycling operation on its property. 181 F.3d 104 (6th Cir. May 14, 1999) (table). The court affirmed the district court's dismissal of the complaint on the basis that documents attached to the complaint showed that the city was concerned about "protecting nearby landowners from noise and dust that *plaintiff's concrete recycling operation would produce*." *Id.* at *3 (emphasis added). Therefore, according

to the court, "the evidence in the record [ ] supplie[d] a reason why [the defendants] 'might have' taken the action they did." *Id.* Here, the reason for suspending Johnson's license was that Johnson's business was "generat[ing]" the violence. Johnson's proposed complaint, however, alleges that is not true, that none of the shooters were connected to her business, and that she had no warning this would happen.

In the second case, *EJS Properties, LLC v. City of Toledo*, the prospective purchaser of a property asserted that the city and a city-council representative violated its substantive-due-process rights after the purchaser refused to pay a bribe and the representative retaliated by opposing the requested rezoning. 698 F.3d 845, 862 (6th Cir. 2012). The court held that the solicitation of the bribe was not conscience-shocking and noted that "the decision not to grant re-zoning passes rational-basis review in light of the clearly expressed desire at numerous meetings to maintain the area for future industrial use." *Id.* Thus, regardless of the bribery attempt, there was a legitimate reason to deny the rezoning. Here, however, there was no alternative reason to suspend Johnson's license. The City's action was irrational because, according to the complaint, despite the City's statements, the shooters were wholly unrelated to Johnson or her business.

Because Johnson adequately pled that the City lacked a rational basis to suspend her license and thus plausibly alleged that the City violated her substantive-due-process rights, we reverse and remand for further proceedings.

**III.**

Johnson's proposed complaint also states a plausible claim for an equal-protection violation based on a "class of one" theory. The proposed complaint alleges that the City suspended her business license after a shooting but did not suspend the licenses of two other businesses that experienced random shootings, Dom's Food Market and Covenant HealthCare.

The Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in

treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).[5] The first element requires that the plaintiff and the others who were treated differently were "similarly situated in all relevant respects." *EJS Properties*, 698 F.3d at 865 (internal quotation marks omitted). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativ[ing] every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005) (internal quotation marks omitted).

Dom's Food Market is similarly situated to Johnson's restaurant. Both establishments sell food to the public, and the circumstances of the shooting at Dom's are similar to the shooting at Johnson's restaurant: a random shooting with unknown shooters. On appeal, Defendants argue that Johnson's restaurant is dissimilar from Dom's on the basis that patrons at the restaurant can consume alcohol on the premises, whereas liquor is merely sold at Dom's. However, there is no indication why this distinction is relevant here. There is no suggestion that alcohol played a role in either shooting. Nor does there appear to be any basis for concluding that Johnson's restaurant's sale of liquor for consumption was related to the random shooting that occurred at her restaurant.

Accepting Johnson's allegations as true, there is no conceivable rational basis for treating her restaurant differently from Dom's. The district court concluded that unlike the shooting at Dom's, the shooting at Johnson's restaurant appeared to be gang-related, and gang-related shootings are likely to be more frequent. The dissent likewise contends that "[t]here is no indication that the shooting[] at the liquor store . . . w[as] gang-related or involved more than one

---

[5]The dissent expresses doubt that Johnson's "class of one" claim survives the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008). Notably, the Court in *Engquist* was addressing a "class of one" claim in the public-employment context, and this court on a number of occasions has declined to address whether *Engquist* applies outside of that context to other discretionary decisions. *See EJS Properties*, 698 F.3d at 864 n.15 (declining to decide whether *Engquist* applies outside of the public-employment context); *Clark v. Johnston*, 413 F. App'x 804, 817 n.12 (6th Cir. 2011) (same); *Aldridge v. City of Memphis*, 404 F. App'x 29, 42 (6th Cir. 2010) (same). There appear to be good reasons to limit *Engquist*'s applicability outside the public-employment context. *See Franks v. Rubitschun*, 312 F. App'x. 764, 766 n.3 (6th Cir. 2009) (suggesting *Engquist* should be limited to public-employment action and relying on *Engquist*'s characterization of the public-employment context as "'unique'" and "its reliance on the 'crucial difference' between government acting as sovereign and government acting as employer" (quoting *Engquist*, 553 U.S. at 598)).

shooter." Op. at 28. As an initial matter, there is no suggestion that the shooting at Dom's was not gang related or did not involve more than one shooter. Rather, the victim was shot "several times" exiting the store, a fact that could suggest more than one shooter. R. 15-1, PID 297. Moreover, the circumstances and manner of the shooting at Dom's and the shooting at Johnson's restaurant appear very similar: unknown individuals arriving and shooting at a business.

Because Johnson's proposed second amended complaint plausibly alleges a "class of one" selective-enforcement claim and her claim was therefore not futile, we reverse the district court's denial of leave to amend her complaint to assert that claim.

**IV.**

We emphasize that this is an appeal from a dismissal on the pleadings and a denial of leave to amend. We accept all of Johnson's well-pleaded facts as true and draw all inferences in her favor. We reverse the district court's dismissal of Johnson's burden-shifting, substantive-due-process, and equal-protection claims. We concur in Judge Nalbandian's opinion in all other respects.