RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0358p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RITA R. JOHNSON,

*Plaintiff-Appellee*,

*v.*

No. 19-1208

CITY OF SAGINAW, MICHIGAN,

*Defendant*,

JASON CABELLO; JOHN STEMPLE,

*Defendants-Appellants*,

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:17-cv-13174—Thomas L. Ludington, District Judge.

Decided and Filed: November 13, 2020

Before: MOORE, SUTTON, and WHITE, Circuit Judges

_____

### COUNSEL

**ON BRIEF:** Gregory W. Mair, Daniel J. LoBello, O'NEILL, WALLACE & DOYLE, P.C., Saginaw, Michigan, for Appellants. Philip L. Ellison, OUTSIDE LEGAL COUNSEL PLC, Hemlock, Michigan, for Appellee.

WHITE, J., delivered the opinion of the court in which MOORE, J., joined. SUTTON, J. (pp. 22–27), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

HELENE N. WHITE, Circuit Judge.  In the early hours of Saturday, May 6, 2017, a gunfight broke out in front of Plaintiff-Appellee Rita Johnson's restaurant in Saginaw, Michigan. At the time, Johnson was renting out the space for a large birthday party.  An initial police investigation concluded that a gang-related fight began inside Johnson's building and then moved into the street.  Later that day, Defendant-Appellant John Stemple directed Defendant-Appellant Jason Cabello to suspend water service to Johnson's building in an effort to prevent her from hosting further events.  Johnson later filed this lawsuit, alleging Defendants violated her procedural and substantive due process rights by shutting off her water without notice and a hearing and without a rational basis.  The parties filed cross-motions for summary judgment. The district court denied qualified immunity to Cabello and Stemple and granted Johnson's summary judgment motion as to them.[1]  Cabello and Stemple appeal.  We affirm in part, reverse in part, and remand for further proceedings.

## I.  Background

Johnson owned and operated a restaurant in Saginaw called Rita's Southern Soul Café (the Café).  Johnson also owned the building.  She rented out the restaurant to organizations and individuals for various events, including birthday parties, wedding receptions, baby showers, fashion shows, dance classes, charitable events, and holiday gatherings.

Johnson rented the Café for the night of Friday, May 5, 2017, to Andrick Pruitt for his birthday party.  Pruitt invited a rapper to perform at the event and hired a security company.  By one account, 400 people attended, although Johnson stated the building's capacity was 315 and claimed 400 people could not fit in the space.  Around 1:30 AM, Johnson was in the kitchen cooking when she saw the guests running, ducking, and hiding.  According to Johnson, she was told that someone across the street was shooting at her building.  In her declaration, Johnson stated that the shooters were not connected to her and she did not believe them to be connected to

———————————

[1]The district court denied Johnson's summary judgment motion against the City.

the event that night. Johnson had another party scheduled for Saturday night but canceled it due to the damage from the shooting.

On Saturday, May 6, City officials suspended Johnson's water service. John Stemple, who served as the chief inspector for the City, made the decision to shut off the water without consulting any other City employee. Stemple reached this decision after receiving information about the shooting from the Saginaw Police Department. According to Stemple, during the party at the Café, there was a "confrontation that occurred between par[t]ies, which moved out into the street. And there was significant gunfire that happened in the middle of Washington Avenue." R. 74-4, PID 1345. Stemple "considered that an emergency situation" and decided to discontinue water service "to protect the health, safety and welfare of the citizens of Saginaw" and "to deter any further activity of that type from occurring until such time that a hearing and investigation [could] occur." *Id.* at PID 1344-45. Stemple relied on Michigan Building Code 112.3 and the City's adoption of that code for his authority to shut off the water to the Café.

Through local ordinance, the City opted to be a local enforcing agency of the Michigan Building Code. That code states in relevant part:

> The building official shall have the authority to authorize disconnection of utility service to the building, structure or system regulated by this code and the referenced codes and standards set forth in Section 101.4 in case of emergency where necessary to eliminate an immediate hazard to life or property or when such utility connection has been made without the approval required by Section 112.1 or 112.2. The building official shall notify the serving utility, and wherever possible the owner and occupant of the building, structure, or service system of the decision to disconnect prior to taking such action. If not notified prior to disconnecting, the owner or occupant of the building, structure or service system shall be notified in writing, as soon as practical thereafter.

Mich. Building Code § 112.3.

Joseph Gough served as the City's utility foreman. Gough testified that he received a call from Stemple requesting that he turn off the water to the building in response to a shooting. Gough then directed Cabello, a utility inspector for the City, to complete the shut off. Cabello did not know why Gough directed him to turn off the water. According to Cabello, he was told, "'Inspections wants this water turned off,' and that's it." R. 74-6, PID 1407. Cabello shut off

the water around 7:30 PM.  Cabello was never advised by the City that there had been no hearing or that notice or hearing were required before shutting off water to a building.

Although Stemple acknowledged that he did not provide Johnson with a notice regarding her water before or after the shutoff, he testified that the City provided Johnson "an opportunity for a hearing related to the closure or suspension of her business activities . . . within five days, as required by the ordinance."  R. 74-4, PID 1346.  Stemple testified that he did not receive training or education regarding his "constitutional obligations as to potable water delivery as a property right, as a constitutional right."  *Id.*  He also stated that he has shut off water to other businesses in response to shootings in the past.  In each instance, Stemple did not provide pre-deprivation notice and, he stated, the "[p]ractice and policy has been consistent throughout."  *Id.* at 1348-49.  In Stemple's view, "the notice of the suspension of the business license covers [water shutoffs] even though it doesn't mention it within the body of the document."  *Id.* at PID 1349.

Johnson received a notice on her door regarding the suspension of her business.  The notice did not mention the water shutoff.  The notice, signed by City Manager Timothy Morales and dated May 8, 2017, stated in part:

> PLEASE BE ADVISED THAT PURSUANT TO THE CITY OF SAGINAW ("CITY") CODE OF ORDINANCE, **ALL ACTIVITY** RELATED TO THE USE AND/OR OPERATION OF THE PROPERTY LOCATED AT 110 N. WASHINGTON AVENUE, SAGINAW, MI 48601, ALSO KNOWN AS "RITA'S SOUTHERN SOUL CAFE" ("ESTABLISHMENT") IS HEREBY SUSPENDED, **EFFECTIVE MAY 8, 2017**.
>
> THE **IMMEDIATE SUSPENSION OF BUSINESS ACTIVITY** HAS BEEN ISSUED PURSUANT TO ORDINANCE 0-1, § 110.06(F), WHICH PROVIDES THAT THE CITY MANAGER MAY IMMEDIATELY SUSPEND ANY LICENSE OR PERMIT ISSUED BY THE CITY OF SAGINAW UPON A DETERMINATION THAT SUCH A SUSPENSION IS NECESSARY "IN THE INTEREST OF THE PUBLIC HEALTH, MORALS, SAFETY, OR WELFARE."

R. 74-8, PID 1429-30.  The notice further advised that a hearing would be held on May 11, 2017. At that hearing, the hearing officer explained, "It is my understanding that this show-cause administrative hearing . . . is in regard to . . . a notice for the immediate suspension of the business activity of Rita's Southern Soul Café."  R. 74-3, PID 1317.

The City's police chief, Robert Ruth, testified that he first met Johnson around 2015, when another party hosted at the Café ended in a similar shooting: "[I]t ended up being a lot of gang members from Saginaw were there at the party, ended up spilling out into the front street, there was a huge fight, and then guns were pulled and there were shots being fired up and down Washington Avenue." *Id.* at PID 1334. Ruth also testified about the ongoing investigation into the shooting at issue:

> The investigation shows that there was a fight inside of Rita's. The security, which was very heavily armed, broke the fight up and pushed everybody outside. The people that were fighting went to their vehicles, retrieved guns, and started shooting back and forth at each other. One of the security guards, the one that was—that had an AK-47 style rifle strapped around his neck, pulled the gun up outside of Rita's and fired off five or six shots into the air. That scared everybody enough to run and go in their own direction. And the shooting stopped at that point.

*Id.* at PID 1335. Sixty shell casings were found in the area, at least one of which was found in the doorway of the Café. Ruth further testified that the investigation showed the incident was gang related. The water-service suspension came up only once during the hearing, when Johnson stated, "My water's off. I don't know why. Maybe somebody here can tell me. I have no idea. I go into my building, my water bill's paid, but the water's off. So I don't know if that's the way of helping to shut me down." *Id.* at PID 1340.

In her deposition, Johnson testified that after her water was turned off, she had issues with the toilets, which "became heavily stained" due to the lack of water for flushing and cleaning. R. 74-2, PID 1307. Johnson also had a pest-control service spray for "sewer flies" which the service advised would come up through the drains due to the lack of water. *Id.* A plumber quoted Johnson $6,000 for repairs. Johnson testified that she continued to make water-bill payments although she was not receiving service. And because her business license was revoked and her water service was discontinued, Johnson had to turn away potential renters. She estimated that she incurred over $80,000 in lost revenue.

Johnson testified that she went to the billing department "about twice" to request that her water service be restored but a representative told her no information regarding the shutoff could be provided. *Id.* at PID 1312. Stemple testified that he did not have knowledge of these visits.

The water to the building was turned back on in October of 2017 in response to the request of Johnson's attorney. When asked how he decided to turn the water on, Stemple responded, "[T]he owner made a request to have the water turned on, and the emergency, as far as I was concerned, no longer existed because the business license was suspended at that time, and therefore, I didn't feel it was necessary to continue that course." R. 74-4, PID 1350. Stemple also stated that the City never turns water back on without a request from the owner and the owner's presence at the building.

## II. Procedural History

Johnson filed suit under 42 U.S.C. § 1983 in the Saginaw County Circuit Court, alleging violations of her procedural and substantive due process rights. Defendants removed the case to federal court. Following discovery, Defendants moved for summary judgment, arguing that they did not violate Johnson's due process rights and that Cabello and Stemple are entitled to qualified immunity. Johnson then moved for summary judgment except as to damages. The district court denied Defendants' motion for summary judgment based on qualified immunity and granted Johnson's motion for partial summary judgment, except on her claims against the City. Cabello and Stemple appeal.

## III. Jurisdiction

"Ordinarily, the denial of a motion for summary judgment is an unappealable interlocutory ruling." *Peterson v. Heymes*, 931 F.3d 546, 553 (6th Cir. 2019). Our jurisdiction reaches appeals from "final decisions of the district courts." 28 U.S.C. § 1291. This includes "jurisdiction over collateral orders—orders that 'finally determine claims of right separable from, and collateral to, rights asserted in the action.'" *Brown v. Chapman*, 814 F.3d 436, 443 (6th Cir. 2016) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)). Although we have interpreted the collateral-order doctrine to permit review of a denial of qualified immunity, we have jurisdiction over the appeal "only 'to the extent that it turns on an issue of law'—the appeal cannot be from a district court's determination that there is a genuine dispute of material fact." *Id.* at 444 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). "[A] defendant denied qualified immunity may appeal only if the issue on appeal is whether the plaintiff's facts, taken

at their best, show that the defendant violated clearly established law." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). "Fact questions, including questions of evidentiary sufficiency, are out of our hands." *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019). "We have also held that a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015).

Relying on this caselaw, Johnson challenges this court's jurisdiction. Johnson argues that the "Defendants continue to adhere to *their* favorable notion that an emergency existed when they terminated potable water delivery service" and that "[b]y not conceding . . . that no emergency existed at the time of the termination of the water supply—Defendants have rendered their challenge outside the jurisdiction of this Court." Appellee's Br. at 26-27. Appellants respond that their "appeal centers entirely on questions of law" and they "concede the most favorable view of the facts to" Johnson. Reply Br. at 1.

Although "a defendant challenging a district court's denial of his motion for summary judgment based on qualified immunity must 'concede the most favorable view of the facts to the plaintiff for purposes of the appeal,'" *Rafferty v. Trumbull County*, 915 F.3d 1087, 1092 (6th Cir. 2019) (quoting *Baker v. Union Twp.*, 587 F. App'x 229, 232 (6th Cir. 2014)), an attempt to dispute the underlying facts does not entirely deprive us of jurisdiction:

> If . . . aside from the impermissible arguments regarding disputes of fact, the defendant also raises "the 'purely legal' question of 'whether the facts alleged . . . support a claim of violation of clearly established law,'" then there is an issue over which this court has jurisdiction. Therefore, this court can ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction.

*Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (second alteration in original) (quoting *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998)).

Appellants' arguments "drift[] from the purely legal into the factual realm," *Berryman*, 150 F.3d at 564-65, when they argue that they could not provide, and Johnson was not entitled to, a pre-deprivation hearing because of an emergency. The district court concluded "that the City of Saginaw could have exercised other options to prevent another event from occurring at

the property" and that "there was nothing preventing the City from exercising other lawful options to address the emergency." R. 84, PID 1814-15. Because Appellants' arguments challenge the district court's factual determination that the shutoff was not reasonably necessary to eliminate an emergency, we lack jurisdiction to consider them on the issue of qualified immunity at this interlocutory stage.[2] *See Quigley*, 707 F.3d at 680.

## IV. Analysis

Cabello and Stemple appeal the denial of qualified immunity.[3] "This court reviews a district court's denial of summary judgment based on qualified-immunity grounds de novo." *Quigley*, 707 F.3d at 679. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Quigley*, 707 F.3d at 679. The key question for this court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

"An assertion of qualified immunity may be overcome if the defendants violated a clearly established constitutional right." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 484-85 (6th Cir. 2014). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right

---

[2]Cabello and Stemple also argue that the district court's order "granting Plaintiff's Motion for Partial Summary Judgement and denying Defendants' Motion for Summary Judgment must be reversed." Appellants' Br. at 6. To the extent that Cabello and Stemple seek to appeal the district court's partial grant of summary judgment to Johnson as it relates to issues other than qualified immunity, we lack jurisdiction to consider their argument. "'[A] partial summary judgment on the issue of liability alone is not a "final decision" under 28 U.S.C. § 1291,' nor does such an order qualify as an immediately appealable collateral order." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 549 (6th Cir. 2002) (quoting *Brennan v. Township of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996)). And Appellants do not request that we exercise pendent appellate jurisdiction. See *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 697 (6th Cir. 2013). Therefore, the issue before us is limited to qualified immunity.

[3]Appellants briefly note that "Cabello was not part of any decision-making process to suspend Plaintiff's water, but simply following the instructions of his work order." Appellants' Br. at 22. Before the district court, however, they did not distinguish between Cabello and Stemple regarding qualified immunity. And, on appeal, they neither develop the argument nor cite to any relevant authority. We therefore decline to address the issue.

was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). "Although addressing both questions is 'often beneficial,' we are 'permitted to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *United Pet Supply*, 768 F.3d at 485 (alteration in original) (quoting *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)).

"An action's unlawfulness must be apparent in light of pre-existing law, but the very action in question need not previously have been held unlawful." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 900 (6th Cir. 2014). The "unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). "[A]n official 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Schulkers v. Kammer*, 955 F.3d 520, 533 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)). Appellants argue that "there has been no violation of Plaintiff's procedural or substantive due process rights" and "[t]he right to continued water service to a business that cannot operate and is suspended to prevent an emergency situation, where a postdeprivation process is available, is not clearly established." Appellants' Br. at 21, 22-23. Johnson contends that Cabello and Stemple violated her clearly established constitutional rights by depriving her of her property interest in continued water service without notice or a hearing (procedural due process claim) and depriving her of that property interest without a rational basis (substantive due process claim).

## A. Procedural Due Process

### 1. The *Parratt* Doctrine

Appellants assert that a pre-deprivation hearing was impossible or impracticable and that "Plaintiff had two meaningful postdeprivation procedures available: the hearing and appeal provided by the City, and a state-law tort action for her damaged toilets." Appellants' Br. at 10-11, 19. Appellants argue that we must therefore reverse under *Parratt v. Taylor*, 451 U.S. 527, 539 (1981) and its progeny. *Id.* We disagree.

"A fundamental requirement of due process is the opportunity to be heard. It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *United Pet Supply*, 768 F.3d at 485 (internal quotation marks omitted) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "When the situation necessitates 'quick action' by the state or makes efforts to provide a meaningful predeprivation process impracticable, the persons acting under state authority may proceed without violating the property owner's rights so long as the state provides an adequate postdeprivation procedure." *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994) (quoting *Parratt*, 451 U.S. at 539). Under the *Parratt* doctrine, "[i]f an official's conduct would otherwise deprive an individual of procedural due process but is 'random and unauthorized,' the *Parratt* doctrine allows the state to avoid liability by providing adequate remedies after the deprivation occurs." *Daily Servs.*, 756 F.3d at 901. Thus, we "may dismiss a procedural due process claim if the state provides an adequate postdeprivation remedy and '(1) the deprivation was unpredictable or "random"; (2) predeprivation process was impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty.'" *Id.* at 907 (quoting *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)).

Here, the record does not support the conclusion that the deprivation was random or unpredictable.[4] Stemple estimated that he has shut off water service to a dozen businesses in response to similar situations and that no notices or hearings were provided. Stemple testified that the "[p]ractice and policy has been consistent throughout" the water suspensions. R. 74-4, PID 1348-49. Stemple further testified that if the same events occurred at a place next door to the Café, he would suspend water service there as well. Similarly, Gough testified that no notices are provided prior to water-service suspensions. Thus, it appears that Johnson's water

---

[4]Appellants also argue that "the onus rests with the Plaintiff to prove that there was no adequate state-law remedy available to adequately compensate her for the alleged harm" and that Johnson failed to do so. Appellants' Br. at 11. However, "[t]he rule requiring a § 1983 plaintiff to show the inadequacy of a state's post-deprivation corrective proceedings . . . applies only where . . . the state cannot feasibly provide a predeprivation hearing." *Silberstein v. City of Dayton*, 440 F.3d 306, 315 (6th Cir. 2006). This was not a random, unauthorized deprivation, nor was this a situation where the state could not "feasibly provide a predeprivation hearing." Thus, Johnson need not show that the state's post-deprivation corrective procedures were inadequate in order to adequately allege a deprivation of her due process rights. *Id.* at 316.

service was ordered suspended in accordance with an established practice. *See Silberstein v. City of Dayton*, 440 F.3d 306, 316 (6th Cir. 2006).

In most cases, "[w]hen a deprivation occurs through an established state procedure, 'then it is both practicable and feasible for the state to provide pre-deprivation process, and the state must do so regardless of the adequacy of any post-deprivation remedy.'" *Id.* (quoting *Walsh v. Cuyahoga County*, 424 F.3d 510, 513 (6th Cir. 2005)). But in some exceptional circumstances— when the "necessity of quick action" renders pre-deprivation process "impossible or impracticable"—pre-deprivation process may be excused even when an action is neither random nor unauthorized. *See Harris*, 20 F.3d at 1402-05 (holding that *Parratt* doctrine excused pre-deprivation process for emergency demolition of decaying home even though the demolition process was "authorized" and performed under "established procedures").

This is not one of those exceptional cases. As we observed in the context of Johnson's business-license suspension, "[g]iven that the City held a hearing within three days of the shooting (after suspending Johnson's license), it does not appear as though it would have been impractical for the City to have held a hearing before suspending her license." *Johnson v. Morales*, 946 F.3d 911, 923 (6th Cir. 2020). The record reveals no reason why the same is not true of the water suspension. Further, the district court found that "there was nothing preventing the City from exercising other lawful options to address the emergency," R. 84, PID 1815, and we lack jurisdiction on interlocutory review to disturb that factual inference, *DiLuzio*, 796 F.3d at 609.[5] "The *Parratt* doctrine prevents liability in order to allow the state to avoid responsibility for denying process it cannot reasonably be expected to provide." *Daily Servs.*, 756 F.3d at 901.

---

[5]The dissent's position relies on a factual disagreement with the district court. It argues that pre-deprivation process was "impracticable and dangerous," and therefore the City could comply with due process by providing an adequate post-deprivation remedy. But the district court found that the City failed to show that pre-deprivation process was impracticable. The dissent's argument can only succeed if we reject the district court's finding. We lack jurisdiction to do so. *See DiLuzio*, 796 F.3d at 609 ("[A] defendant may not challenge the inferences the district court draws from [the] facts, as that too is a prohibited fact-based appeal."). The same point applies to the dissent's effort to align this case with several prior decisions where the need for quick action rendered pre-deprivation process impossible or impracticable—a comparison that only holds water if we discard the district court's determination that the City had other options here. *See* Dissent at 23 (citing *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950); *N. Am. Cold Storage Co. v. Chicago*, 211 U.S. 306 (1908); *Fahey v. Mallonee*, 332 U.S. 245, 247 (1947); *Harris*, 20 F.3d at 1403-05 (6th Cir. 1994)); Dissent at 25 (arguing that these cases show that "prevailing law . . . support[s] Saginaw, not Johnson," because in those cases, "[t]he Supreme Court and this court have both authorized more dramatic and final government gestures without process").

Here, the circumstances support that Appellants could be reasonably expected to provide pre-deprivation process.

Lastly, the suspension of Johnson's water service was not the type of "unauthorized" conduct contemplated by *Parratt*.  In *Zinermon v. Burch*, the Supreme Court limited the applicability of the *Parratt* doctrine.  494 U.S. 113 (1990).  The Court considered Burch's claim that staff at Florida State Hospital "deprived him of his liberty, without due process of law, by admitting him to FSH as a 'voluntary' mental patient when he was incompetent to give informed consent."  *Id.* at 115.  The Court held that *Parratt* was inapplicable, in part because the employees' conduct was not "'unauthorized' in the sense the term is used in *Parratt*."  *Id.* at 138.  The Court reasoned that "[t]he State delegated to them the power and authority to effect the very deprivation complained of here" and that the deprivation was "'unauthorized' only in the sense that it was not an act sanctioned by state law, but, instead, was a 'depriv[ation] of constitutional rights . . . by an official's abuse of his position.'"  *Id.* (second and third alterations in original) (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).  Similarly, here, Appellants cannot now claim that their actions, which they initially argued were reasonable and in accordance with the City's policies, were random and unauthorized in order to defeat Johnson's procedural due process claim.  *Schulkers*, 955 F.3d at 548.

The deprivation was not random, unpredictable, or unauthorized in the *Parratt* sense and pre-deprivation process was not impossible or impracticable.  Therefore, the *Parratt* doctrine is inapplicable.

### 2.  Constitutional Violation

To determine if Johnson received adequate procedural due process, we apply the balancing test developed in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *United Pet Supply*, 768 F.3d at 485.  We weigh three factors: (1) Johnson's private interest affected by the shutoff, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

First, as the district court noted, "[t]here can be no dispute that Johnson was deprived of a property interest." R. 84, PID 1816. "The Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess." *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273 (6th Cir. 1988). Further, "[t]he city, as a water company, cannot do as it will with its water. It owes a duty to each consumer. The consumer, once taken on to the system, becomes dependent on that system for a prime necessity of business, comfort, health, and even life." *Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.2d 153, 163-64 (6th Cir. 1973) (quoting *Wood v. City of Auburn*, 32 A. 906, 908 (Me. 1895)).[6] Appellants argue that "there would be no reason to supply water to an abandoned building." Appellants' Br. at 13. However, the building was not abandoned. Potential customers continued to inquire about the venue's availability as Johnson tried to restore her business. Johnson testified that she had to turn down business opportunities and lost over $80,000 in revenue. Further, she had a plumber and a pest-control service inspect the building. She also "[h]ad to go buy garbage cans and pay somebody to carry them into the building . . . and wash dishes and wash everything down." R. 74-2, PID 1305-06. Because of the damage resulting from the shooting and the water shutoff, Johnson was at the building to clean, replace the windows, and fix the toilets. Appellants further argue that the deprivation was "temporary" and "minor." Appellants' Br. at 13. However, Johnson had no water service for five months. And the Supreme Court has held that "[a]lthough utility service may be restored ultimately, the cessation of essential services for any appreciable time works a uniquely final deprivation." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 20 (1978). Thus, the first *Mathews* factor weighs in Johnson's favor.

---

[6]The dissent argues that the first *Mathews* factor does not favor Johnson because she had "a *commercial* interest in the water, not a *residential* interest." Dissent at 24. The dissent cites no authority to support this distinction. The dissent's position is at odds with our recognition that water is a "prime necessity of business," *Palmer*, 479 F.2d at 163, and that a "property interest in a person's means of livelihood is one of the most significant that an individual can possess," *Ramsey*, 844 F.2d at 1273.

The second factor, the risk of an erroneous deprivation through the procedures used and the value of additional safeguards, also weighs in Johnson's favor. "The 'root requirement' of the Due Process Clause requires that 'an individual be given the opportunity for a hearing *before* [she] is deprived of any significant property interest.'" *Silberstein*, 440 F.3d at 315 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). In some situations, "the failure to provide a pre-deprivation hearing does not violate due process" if "the government provided adequate post-deprivation process." *United Pet Supply*, 768 F.3d at 486. Here, however, the post-deprivation process was inadequate and created a significant risk of erroneous deprivation. Appellants argue that Johnson had "an opportunity to be heard on the suspension of her water" and point to her statements at the show-cause hearing. Appellants' Br. at 9. However, the notice sent to Johnson did not mention her water service. And the shutoff was not the stated subject of the hearing and was mentioned only once, by Johnson herself, to express her confusion and to ask for an explanation, which she never received. Thus, Johnson did not receive "notice of the case against [her] and opportunity to meet it." *Mathews*, 424 U.S. at 348-49 (internal quotation mark omitted) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172 (1951)). And, as the Supreme Court observed, "the probability of error in utility cutoff decisions is not so insubstantial as to warrant dispensing with all process prior to termination." *Memphis Light*, 436 U.S. at 20.[7]

The third factor is the government's interest and the burden of additional procedures. Appellants argue that they "had a strong interest in preventing further violence from recurring at Plaintiff's business." Appellants' Br. at 15. Although "the government has a substantial interest in ensuring the safety of its citizens," *Johnson*, 946 F.3d at 923, Appellants do not explain why they could not use other means of furthering that interest without violating Johnson's constitutional rights. And even if we accept that providing a pre-deprivation hearing would have been burdensome, it would not have been burdensome to address the water suspension at the

---

[7]The dissent suggests that the second *Mathews* factor cuts against Johnson because "[g]overnment conduct with a 'low incidence of abuse' requires less process," and water shutdowns in Saginaw were rare, occurring "only one time" or "only a few" times. Dissent at 24 (citations and brackets omitted)). But John Stemple testified that that he had shut down water in similar situations at least a dozen times, and that such actions were part of a "consistent . . . [p]ractice and policy." R. 74-4, PID 1347-49. The dissent's suggestion that these shutdowns only happened "once" or "a few" times fails to read the record in the light most favorable to Johnson, which we must do at this stage.

show-cause hearing and notify Johnson of her opportunity to be heard on the subject. Thus, on balance, this factor also weighs in Johnson's favor.

Because of Johnson's significant interest in continued water service, the high risk of an erroneous deprivation, and the value and minimal burden of additional safeguards, we conclude that Appellants violated Johnson's constitutional right to procedural due process.

### 3. Clearly Established Right

In the context of Johnson's procedural due process claim, "the 'clearly established law' inquiry should ask whether a reasonable official would understand that the plaintiff was entitled to notice and an opportunity to be heard" prior to suspending her water service. *Daily Servs.*, 756 F.3d at 903. "[T]he Supreme Court has held that the hallmark of due process is that a deprivation of a property interest must be 'preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 901 (6th Cir. 2019) (quoting *Chandler v. Village of Chagrin Falls*, 296 F. App'x 463, 470 (6th Cir. 2008)). For Johnson "to have a constitutionally recognized property interest in the benefit of water service, she 'must have more than an abstract need or desire for it[,] . . . more than a unilateral expectation of it. [She] must, instead, have a legitimate claim of entitlement to it.'" *Golden v. City of Columbus*, 404 F.3d 950, 955 (6th Cir. 2005) (alterations in original) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). The Supreme Court has recognized two sources for such a claim of entitlement: "state statutes and contracts, express or implied, between the complaining citizen and the state or one of its agencies." *Id.* Therefore, as a paying customer with a contract for water service, Johnson had a constitutionally recognized property interest in continued water service. Appellants do not claim otherwise.

Appellants argue instead that "the right to ongoing utility services to a business that cannot operate . . . is not clearly established." Appellants' Br. at 19. There are several problems with this argument. First, Appellants made a somewhat different argument before the district court.[8] Second, we previously held "that Johnson . . . stated a viable procedural due process

---

[8]Cabello and Stemple, in their response to Johnson's summary judgment motion, conceded that Johnson had a "constitutionally protected property interest" in "water service to [her] business," but argued that under the

claim based on the government's failure to provide her some type of hearing before suspending her [business] license." *Johnson*, 946 F.3d at 925. Appellants therefore have not established that Johnson was validly prevented from operating her business. If the business suspension was not valid, it would not support the water suspension. Finally, Appellants ignore that when they suspended the water service, they cut off service not only to Johnson's business but also to the building she owned. Thus, even if the suspension of Johnson's business license called into question her right to continued water service as a business owner, Appellants have not explained how this would negate her right to water service as the owner of the building.

"It is well settled that the expectation of utility services rises to the level of a 'legitimate claim of entitlement' encompassed in the category of property interests protected by the due process clause." *Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1474 (6th Cir. 1993). "[P]laintiff's rights were violated when her service was terminated without any procedural safeguards to protect her right." *Myers v. City of Alcoa*, 752 F.2d 196, 200 (6th Cir. 1985). "Notice in a case of this kind does not comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified." *Memphis Light*, 436 U.S. at 14-15. And "some administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding of essential services." *Id.* at 18. Therefore, "[r]easonable officials in the defendants' positions would know that predeprivation process—notice and an opportunity to be heard—was required before" suspending Johnson's water service. *Daily Servs.*, 756 F.3d at 904. We conclude that Johnson's right to procedural due process prior to the deprivation of water service was clearly established

---

balancing test developed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), "the interest in the continuation of her water service to a business that cannot operate[] is relatively minor." R. 79, PID 1774-75. They did not argue in their motion for summary judgment, their reply to Johnson's response, or in their response to Johnson's summary judgment motion, that Johnson lacked a clearly established and constitutionally protected property right in continued water service due to the business-license suspension. Then, in their brief supporting a stay of proceedings pending appeal, Cabello and Stemple explained that on appeal they would "contend that although Plaintiff has a continued property interest in the water supply to her business, the interest does not extend so far as to encompass that right for a business that cannot operate." R. 89, PID 1942. In other words, Cabello and Stemple argued below that they imposed only a minor burden on a recognized right to water service. But on appeal, that argument morphed into an assertion that there *was no right* to water service when a business cannot operate. "Generally, we will not address arguments raised for the first time on appeal." *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014).

and the denial of qualified immunity to Appellants on Johnson's procedural due process claim was proper.**9**

## B.  Substantive Due Process

### 1.  Constitutional Violation

Appellants also challenge the district court's denial of qualified immunity on Johnson's substantive due process claim.  "Substantive due process is '[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'"  *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (alteration in original) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)).  There are "various contexts in which courts have found that substantive due process is violated— including that the action was 'willful and unreasoning,' 'shocks the conscience,' was 'extreme[ly] irrational[ ],' or lacks 'some factual basis.'"  *Johnson*, 946 F.3d at 937 n.4 (quoting *City of Grand Blanc*, 961 F.2d at 1221-22).  Substantive due process also protects "[t]he right not to be subject to 'arbitrary or capricious' action by a state either by legislative or administrative action."  *City of Grand Blanc*, 961 F.2d at 1217.**10**

---

**9**The dissent argues that the City did not violate any clearly established law, but its arguments are flawed for the reasons given above.  Its attempt to compare this case to *Ewing*, *North American Cold Storage Co.*, and *Harris* relies on a factual disagreement with the district court that we cannot credit.  *See supra* at 11 n.5.  Its suggestion that *Memphis Light* does not help Johnson because it involved a residential interest in utilities—as opposed to commercial one—fails to account for *Palmer* and *Ramsey*, which clearly recognize that a water is "a prime necessity of business," *Palmer*, 479 F.2d at 163, and that "the property interest in a person's means of livelihood is one of the most significant that an individual can possess," *Ramsey*, 844 F.2d at 1273.  And its suggestion that *Memphis Light*—but not this case—involved a "routinized" discontinuance of water fails to account for John Stemple's testimony that the water shutdowns in this case were part of a "consistent . . . [p]ractice and policy," and that he had similarly shut down water on at least a dozen other occasions.  R. 74-4, PID 1347-49.

**10**Since *City of Grand Blanc*, this court has sometimes described "the right to be free from 'arbitrary and capricious' governmental actions" as "another formulation of the right to be free from conscience-shocking actions." *Range*, 763 F.3d at 588.  The *City of Grand Blanc* court, however, addressed these as separate strands of substantive-due-process analysis.  961 F.2d at 1217.  Similarly, in *Harris v. City of Akron*, we explained that a substantive due process claim may arise from "official acts that are unreasonable and arbitrary and 'may not take place no matter what procedural protections accompany them.'"  20 F.3d at 1405 (quoting *Wilson v. Beebe*, 770 F.2d 578, 586 (6th Cir. 1985)).  And in *Warren v. City of Athens*, we reaffirmed "that a substantive due process violation occurs when arbitrary and capricious government action deprives an individual of a constitutionally protected property interest" without reference to the shocks-the-conscience standard.  411 F.3d 697, 707 (6th Cir. 2005).

"Proving a violation of substantive due process requires not only that the challenged state action was arbitrary and capricious, but also that the plaintiff has a constitutionally protected property or liberty interest." *Andreano v. City of Westlake*, 136 F. App'x 865, 870-71 (6th Cir. 2005). As discussed above, Johnson's "expectation of utility services rises to the level of a 'legitimate claim of entitlement' encompassed in the category of property interests protected by the due process clause." *Mansfield*, 988 F.2d at 1474.

Appellants argue that the Michigan Building Code provided a rational basis for their actions. They challenge the district court's interpretation and conclusion that the ordinance authorizing disconnection of utilities did not apply because "the 'emergency' must be in the context of the maintenance and use of the actual building" rather than an emergency related to "criminal activity occurring outside the building." R. 84, PID 1813-14; Appellants' Br. at 15-18. However, whether or not the district court's interpretation is correct, neither Appellees nor the district court point to any controlling authority suggesting that the simple misinterpretation and misapplication of a municipal ordinance constitutes a violation of substantive due process. And, we have rejected similar arguments.[11]

---

[11]For example, we considered a § 1983 claim "brought by a workman who was accidentally injured on a school construction project." *Lewellen v. Metro. Gov't of Nashville & Davidson Cnty.*, 34 F.3d 345, 346 (6th Cir. 1994). Lewellen worked at a building site that was "directly beneath a 23,900-volt 'open conductor' power line." *Id*. It was "uncontested that the presence of the energized power line this close to the new building violated applicable safety and electrical code standards." *Id.* at 347. Still, no one "warned construction workers about the power line" and "Lewellen sustained a severe electrical shock that caused extensive third-degree burns." *Id.* Lewellen's "theory was that the defendants had deprived him of liberty and/or property without due process of law in violation of his 'substantive' rights under the Fourteenth Amendment." *Id.* at 346. Despite the code violations, we concluded there was no constitutional violation. *Id.* at 351.

And in a habeas corpus action, we considered the petitioner's argument that Ohio courts had erroneously interpreted the Ohio speedy trial statute. *Hutchison v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984). We explained that "[e]ven if it could be said that the state court's interpretation is wrong, it has long been recognized that 'a mere error of state law' is not a denial of due process." *Id.* (quoting *Gryger v. Burke*, 334 U.S. 728, 731 (1948)).

Other circuits that have examined this issue have reached the same conclusion. *See Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 711 (7th Cir. 2004) (holding that "an error of state law is not a violation of due process."); *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1105 (8th Cir. 1992) (rejecting the "assertion that the City's enforcement of an invalid zoning ordinance is the kind of 'truly irrational' governmental action which gives rise to a substantive-due-process claim"); *Amsden v. Moran*, 904 F.2d 748, 757 (1st Cir. 1990) (holding "that a regulatory board does not transgress constitutional due process requirements merely by making decisions 'for erroneous reasons' or by making 'demands which arguably exceed its authority under the relevant state statutes'" (quoting *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 832 n.9 (1st Cir. 1982))); *Crocker v. Hakes*, 616 F.2d 237, 239 n.2 (5th Cir. 1980) (characterizing the argument that a city council "did not have discretion whether to enforce the determination of the zoning board of appeals" as "not of constitutional

Two additional arguments, however, support Johnson's claim that the water shutoff violated her substantive due process right to be free from arbitrary or capricious state action. First, in considering Johnson's substantive due process claim regarding the suspension of her business license, we explained, "The City's action is only rationally related to promoting public health, morals, safety, or welfare if it somehow deters or prevents conduct that threatens those interests. Thus, suspending Johnson's license is rational only if Johnson and her business somehow caused or contributed to the violence." *Johnson*, 946 F.3d at 938. The same reasoning applies here.**12** Appellants assert that the party hosted at Johnson's business precipitated the shooting. But the issue before us "is whether the plaintiff's facts, taken at their best, show that the defendant violated clearly established law." *Quigley*, 707 F.3d at 680. Johnson stated in her declaration that the shooting had no connection to her or her business. Stemple also testified that his goal was to prevent Johnson from hosting another event that might attract further violence. Johnson, however, testified that she could not hold another event that weekend because of damage from the shooting and because her "windows were busted." R. 74-2, PID 1311-12. Viewing the evidence in the light most favorable to Johnson, the water shutoff could not rationally prevent further violence and "a reasonable jury could find that [Stemple] acted arbitrarily and capriciously in deciding to" shut off Johnson's water service. *Paterek v. Village of Armada*, 801 F.3d 630, 649 (6th Cir. 2015).

Second, Appellants failed to restore Johnson's water service for five months. Stemple testified that the City "never turns any water back on, regardless of the circumstances, without a request from the owner. The owner has to be present for that water turn-on to ensure that valves aren't open, ultimately racking up a high bill for the person." R. 74-4, PID 1351. In the abstract, that might be a reasonable practice. However, Stemple could not point to any formal policy regarding requests or provide any procedure by which Johnson could make such a request, stating only, "That's in the water department's rules, I would assume. I don't know." *Id.* at

proportions" and concluding that "[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution").

**12**In *Johnson v. Morales*, Johnson appealed "the district court's order dismissing her case for failure to state a claim." 946 F.3d at 916. We concluded that "Johnson adequately pled that the City lacked a rational basis to suspend her license and thus plausibly alleged that the City violated her substantive-due-process rights." *Id.* at 939. The record here contains evidence not presented in that case, including the show-cause hearing transcript and the depositions of Cabello and Stemple.

1350-51. According to Stemple, Johnson's water service was not restored before October 2017 "[b]ecause the owner did not request it." *Id.* at 1350. Johnson, however, testified that she went to the billing department "about twice" to ask that her water be turned on. R. 74-2, PID 1312. She also inquired about her water service at the show-cause hearing and clearly hoped that someone present could assist her in restoring it. Viewing the evidence in the light most favorable to Johnson, it would be arbitrary and capricious for Appellants to deny or ignore her requests. Further, as the district court concluded, the goal of preventing future violent incidents "was completely accomplished by terminating Johnson's business license. . . . The utter redundancy of the decision to discontinue water services suggests that it was 'willful and unreasoning action.'" R. 84, PID 1823. And, as Stemple testified, it was not "necessary to continue that course" once "the owner made a request to have the water turned on, and the emergency . . . no longer existed because the business license was suspended." R. 74-4, PID 1350. Once Johnson's business license was suspended, the water shutoff served no rational purpose.

For these reasons, Johnson has made an adequate showing that the water shutoff violated her right to substantive due process.

## 2. Clearly Established Right

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). "[T]here must either be 'controlling authority or a robust consensus of cases of persuasive authority.'" *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014)). "Officials do not enjoy qualified immunity simply because the exact conduct in question has not previously been held unlawful by a court, but 'in the light of pre-existing law the unlawfulness must be apparent.'" *Lanman v. Hinson*, 529 F.3d 673, 688 (6th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Johnson argues that at the time of the deprivation, it was clearly established that Defendants could not suspend her water service in an arbitrary and capricious manner.**13** The cases she cites in support, however, are not "clear enough that every reasonable official would interpret [them] to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590. Although *Myers*, *Memphis Light*, and *Palmer* support Johnson's right to *procedural* due process in the utility context, they did not address substantive due process. And in *Mansfield*, we concluded that the challenged state action did "not violate the substantive aspects of the Due Process Clause of the Fourteenth Amendment." 988 F.2d at 1478. Therefore, these cases do not clearly establish the circumstances in which the requirements of substantive due process prohibit a local official from suspending a customer's water service.

Because "existing law" did not place "the constitutionality of the officer's conduct 'beyond debate,'" we conclude that Appellants are entitled to qualified immunity on Johnson's substantive due process claim. *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, (2011)).

## V. Conclusion

In sum, we affirm the denial of qualified immunity on Johnson's procedural due process claim, reverse the denial of qualified immunity on her substantive due process claim, and remand for further proceedings consistent with this opinion.

---

**13**In the context of her substantive due process argument, Johnson also asserts that "Defendants were on fair notice that such property interests existed and could not be arbitrarily and capriciously taken without due process. Defendants instead provided no due process of any type." Appellee's Br. at 38. But the lack of pre-deprivation procedure is the basis of Johnson's procedural due process claim. And "substantive due process concepts are not available to provide relief when another provision of the Constitution directly addresses the type of illegal government conduct alleged by the plaintiff." *Warren*, 411 F.3d at 706-07.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

SUTTON, Circuit Judge, concurring in part and dissenting in part. This much and no more, the City of Saginaw decided, after Rita Johnson's café hosted another late-night party gone awry and after it defied prior orders designed to protect the safety and health of people in the area. In the face of a regulation-defying party that ended with still another gun fight, Saginaw decided to revoke the café's license and shut down its water. With respect to my colleagues, that reasonable decision did not violate any clearly established due process rights.

Fiction could not improve the facts. On Friday, May 5, 2017, Johnson rented her restaurant—Rita's Soul Food Café—for an adult birthday party slated to run until 2:00 a.m. But that was not supposed to happen: She had previously assured police she would not host late-night events after a shooting occurred at one of her past soirees. Flyers for the party advertised a "[c]ash bar all night." R.74-3 at 5. That wasn't supposed to happen either: Johnson's café didn't have a liquor license, and the Lansing Liquor Control Commission had already sanctioned it for just that reason. Perhaps because the event's featured entertainment—a rapper named "Peezy"—had encountered conflicts with local gang members before, the venue retained an eighteen-member private security force. At least one guard had an AK-47 assault rifle.

Trouble began around 1:00 a.m. Partygoers started a fight inside the café. When security sent them outside, the situation deteriorated. Some of the partygoers went to their vehicles, fetched their guns, and "started shooting back and forth at each other." *Id.* at 20. The firefight blew out the café's window and damaged neighboring property. The bedlam ended when a security guard discharged his AK-47 into the air.

Saginaw officials suspended Johnson's business license pending an investigation and a hearing. Johnson does not challenge that action here. She objects to the decision to shut off the water to the business, claiming it violated due process.

To prevail, Johnson needs to show that the government deprived her of a property interest without process. *See Kerry v. Din*, 576 U.S. 86, 90 (2015). The parties agree that Johnson has a protected interest in the water. *See Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 10–11 (1978). The dispute turns on process, both before and after the city shut the water off.

*Pre-deprivation process.* Start with Johnson's claim to a hearing before the shutoff. Officials customarily should give process before divesting a property interest. *See, e.g.*, *id.* at 18. But that presumption does not hold where circumstances create a "necessity of quick action." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435 (1982) (quotation omitted). And it does not hold when quick action would protect people and property from danger. *See Parratt v. Taylor*, 451 U.S. 527, 538–39 (1981).

For example: The Supreme Court has rejected similar due process claims when officials confiscated and destroyed potentially harmful drugs, *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950); collected and destroyed potentially dangerous food, *N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306 (1908); and seized property based on a bank's "unfit and unsafe" business conduct, *Fahey v. Mallonee*, 332 U.S. 245, 247 (1947). And we have declined to find a violation when officials destroyed a home deemed "dangerously close" to collapse. *Harris v. City of Akron*, 20 F.3d 1396, 1398, 1403–05 (6th Cir. 1994).

This case, like these cases, required quick action. Late at night, Johnson hosted a party that defied prior orders of the city, one she knew created sufficient peril that armed guards were in order. The party triggered an O.K. Corral-esque shootout, not for the first time, that easily could have killed someone, whether a bystander at the party or a hapless citizen in the neighborhood. Officials had a quick decision to make. They concluded, quite reasonably, that public safety required shutting down the café right away. In the face of prior violations of its orders, the city found that turning off the water would secure that end. That led them to invoke Michigan Building Code § 112.3, which allows officials to "authorize [a] disconnection of utility service[s] to [a] building . . . in case[s] of emergency where necessary to eliminate an immediate hazard to life or property."

Johnson acknowledges that the order prevented her from putting on parties she otherwise would have hosted. Had the officials afforded prior process, it would have delayed the shutoff, giving Johnson more time to continue to misuse the property and making prior process "impracticable" and dangerous to boot. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2014) (quotation omitted).

Each of the *Mathews* factors readily supports this conclusion. Begin with the "private interest" at stake. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Even as access to utilities constitutes an essential resource, Johnson alleges a *commercial* interest in the water, not a *residential* interest. While turning off water to a home imperils the residents' "health and safety," *Memphis Light*, 436 U.S. at 18, the same is not true for a business like this one that could not operate anyway under the city's (unchallenged) order. The "mere postponement of the judicial enquiry is not a denial of due process" in this context. *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 611 (1974) (quotation omitted). Remember that the officials did not "finally deprive" Johnson of any protected interest. *Id.* They could always restore her water and pay damages down the road, an approach much different from property invasions that deny the owner a right to object at all. *See Ewing*, 339 U.S. at 599–600; *N. Am. Cold Storage Co.*, 211 U.S. at 319–20; *Harris*, 20 F.3d at 1403–05.

The "risk of an erroneous deprivation" cuts against Johnson too. *Mathews*, 424 U.S. at 335. Government conduct with a "low incidence of abuse" requires less process. *Ingraham v. Wright*, 430 U.S. 651, 682 (1977). Water shutdowns occur rarely in Saginaw, and safety-related shutdowns occur still more infrequently. In Cabello's memory, "this situation [has] happened [only] one time." R.74-6 at 19. And Stemple could think of only a few analogous incidents in all his time on the job. That is not a lot of risk.

Shift to the "governmental interests at stake." *Mathews*, 424 U.S. at 340. Saginaw officials have a self-evident need to conduct emergency water shutdowns, as anyone who has dealt with a burst pipe can attest. It's not hard to see why they may exercise that same authority to close a business responsible for serial out-of-control parties that had already defied prior orders of the city and had led to gang fights. Think of it this way: While a burst pipe may not have triggered the shutdown, this functioning pipe had facilitated a lot of perilous behavior. In

either setting, quick undaunted action "deter[s] any further activity of [a similar] type from occurring until such time that a hearing and investigation can occur." R.74-4 at 3. When faced with situations like this one, accountability is best secured by retroactive relief. If you doubt me, ask how you would feel if fate made you the neighbor of Rita's Café.

But all of this warms up the reader for a glaringly straightforward ground for decision: Johnson cannot possibly overcome qualified immunity. She has not identified any case clearly establishing that government officials must provide pre-deprivation process before discontinuing utilities to a business that endangered the public in so many life-threatening ways. Her key case, *Memphis Light*, gives comparison a bad name. It concerned the *routinized* discontinuance of *residential* water services due to *nonpayment*. It has nothing to say about the *targeted* discontinuance of *commercial* water services due to repeated *public safety and welfare* violations. As one might suspect, the prevailing law in truth tacks hard the other way, supporting Saginaw, not Johnson. The Supreme Court and this court have both authorized more dramatic and final government actions without process when officials identified a concern for the safety and welfare of others. *See, e.g.*, *Ewing*, 339 U.S. at 600; *N. Am. Cold Storage Co.*, 211 U.S. at 319–20; *Harris*, 20 F.3d at 1403–05.

*Post-deprivation process*. Even where due process does not demand a hearing beforehand, an individual's protected interest cannot be taken without "some kind of hearing . . . at some time." *Parratt*, 451 U.S. at 540. Had Johnson never received an opportunity to challenge the water shutoff, that would be one thing. But Saginaw gave her that opportunity, and a transcript proves it.

Recall the order of events and the hearing that followed them. The shooting at Johnson's café occurred in the early-morning hours on Saturday, May 6. Stemple ordered the discontinuance of the water later that evening. On Monday, May 8, the first business day after the shooting, Johnson received a notice from the City Manager. It advised her that "all activity related to the use and/or operation" of her café was suspended, effective immediately. R.74-8 at 1. And it informed her that a "hearing ha[d] been scheduled" for Thursday, May 11, three days after receipt of the notice and four days after stopping the water. *Id.*

The May 11 hearing offered all the safeguards typical of a trial-like adjudication. Johnson and the prosecution gave opening and closing statements. Both had an opportunity to call witnesses. Both cross-examined opposing witnesses. Neutral officials presided. Johnson referred to the water shut-off, twice mentioning its discontinuance in the course of the hearing. But she never asked the city to turn the water on. To this day, she has not explained her failure to do so. And to this day, she has not presented any evidence that the hearing she received would not have given her the relief she seeks if only she had asked for it. Johnson had bigger fish to fry and understandably so: She wanted to get her license back. But that legitimate strategy does not a due process violation make.

Johnson also failed to show that she lacked other avenues for relief under Michigan law. *See Hudson v. City of Highland Park*, 943 F.3d 792, 801 (6th Cir. 2019); *Vicory v. Walton*, 721 F.2d 1062, 1063 (6th Cir. 1983). As a general rule, any mechanism for securing retroactive relief does the trick. *See Zinermon v. Burch*, 494 U.S. 113, 128 (1990). Because Johnson "does not allege that [Michigan's] post[-]deprivation remedies are inadequate," she cannot recover. *Daily Servs.*, 756 F.3d at 910. That's true even if "state remedies may not provide" her with "all the relief [that] may have been available if [she] could have proceeded under § 1983." *Parratt*, 451 U.S. at 544.

Johnson points out that, *after* the hearing, she "made contact with the City of Saginaw . . . and inquired why the City did not resume potable water delivery/utility services to [her] building." R.75-12 at 4. She adds that officials "refused to resume potable delivery/utility services." *Id.* But by then Saginaw had already provided her process; the Constitution does not allow Johnson to litigate deficiencies in its *post*-process process. Johnson could not prevail on the point anyway. Even at that late hour, she did not introduce any evidence (or even any allegations) clarifying these interactions. When and where did they take place? Who did she speak to? What was said? We don't know. Stemple's only "recollection is [that] Rita Johnson visited [the] water department" at some point, and he insists that he "did not have any objection to the water being turned back on" at that time. R.74-4 at 10. On his account, the first direct request for water reinstatement that his office received from Johnson came in the form of the September 29, 2017 correspondence from her lawyer. Once they received that request, they

restored her water—without incident—within four days. This is not what the people had in mind when they ratified the Due Process Clause.

Johnson claims that the officials erred in not automatically reversing the shutoff after the May 11 hearing. But to what end? After the hearing, Johnson's business license remained suspended. And the officials knew that Saginaw had zoned Johnson's building only for business use. Because the building could no longer serve that function, it lay abandoned so far as any of the officials knew. Turning on water to an abandoned building does no one any good and raises new risks of its own.

But even if I were wrong about all of this, I remain bewildered by Johnson's claim that the city's actions violated clearly established law. *Memphis Gas & Light* is no more useful here than it was above. That case involved an automatic shutdown of water for nonpayment of a bill to a home whose residents could use the water and indeed needed the water to live. This case involves an earned shutdown of water to a business based on serial violations of public safety, and the owner could not use the water until the business could obtain its license to operate again.

As for Johnson's substantive due process claim, I agree with the court that she did not establish the violation of a clearly established right, and I would leave it at that.